UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LA'SHANE DONYALE SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>DR. AARON HAYNES, Chief Medical Official;<br>KAYLA TINKER, Medical Trainer/Supervisor;<br>RESPONSIBLE CLINICIAN, Directly<br>Responsible; UNKNOWN HEALTH SERVICE<br>STAFF, "Nurse Sarah"; UNKNOWN SPECIAL<br>SECURITY OFFICIALS; KELLIE WASKO,<br>Secretary of the Dept. of Corrections; SGT<br>MOORE, Officer In Charge; OFFICER<br>HALEY, Corrections Officer; OFFICER<br>ELEHRS,[1] Corrections Officer; OFFICER VAN<br>BLAIR COM, Corrections Officer; OFFICER<br>KEROESKA, Corrections Officer; CHIEF<br>WARDEN TERESA BITTINGER, Chief<br>Warden; CHAPEL POLICY MAKER,<br>Supervisor; UNIT COORDINATOR<br>ROBINSON, Unit Coordinator; CHIEF<br>TANYA,[2] of Aramark; ARAMARK CO.; UNIT<br>COORDINATOR PECHOUS; HEALTH<br>SERVICE STAFF MEMBER ALEXIS;<br>MELISSA MATURAN, ADA<br>Coordinator/Corrections Specialist;<br>ASSOCIATE WARDEN JOHNSTON,<br>Associate Warden of the State of South Dakota<br>Department of Corrections; SGT. ROWER,<br>Correctional Officer of the State of South<br>Dakota Department of Corrections; UNIT<br>MANAGER EKEREN, Unit Manager of the | 4:23-CV-04115-RAL<br><br><br>OPINION AND ORDER DENYING<br>PLAINTIFF'S MOTIONS TO APPOINT<br>COUNSEL AND FOR A PRELIMINARY<br>INJUNCTION, DIRECTING SERVICE,<br>AND 1915A SCREENING OF AMENDED<br>COMPLAINT |

---

[1] Scott refers to this defendant as Elehrs and Elehrst. Because Elehrs is the name that Scott used in the caption, this Court will refer to the defendant as Elehrs. See Doc. 1 at 1.

[2] Scott refers to this defendant as both Tanya and Tonya. Because Tanya is the name that Scott used when requesting to add her as a defendant, this Court will refer to the defendant as Tanya. See Doc. 15 at 10.

South Dakota Department of Corrections; UNIT
MANAGER ELLIS, Unit Manager of the South
Dakota Department of Corrections; UNIT
MANAGER HANSON, Unit Manager of the
South Dakota Department of Corrections;
JEANNIE BERTSCH, Prison Official of the
South Dakota Department of Corrections; UNIT
COORDINATOR MAYER, Unit Coordinator at
the Department of Corrections; RYAN, Medical
Supervisor/Leadership; CLINICIAN DIRECT
RESPONSIBLE; JOHN DOE/JANE DOE,
Health Service Staff Directly Responsible at the
South Dakota Department of Corrections;
NURSE SARAH, Health Service Nurse of the
State of South Dakota Department of
Corrections; JOHN DOE, Aramark Food Service
Company Chief Supervisors; and GTL
GLOBAL TEL * LINK CORPORATION, VIA
PATH TECHNOLOGIES, John Doe, Chief
Supervisors,

                              Defendants.

Plaintiff La'Shane Donyale Scott, an inmate at the South Dakota State Penitentiary (SDSP), filed another pro se civil rights lawsuit under 42 U.S.C. § 1983, containing a plethora of gripes and contentions. Doc. 1. This Court granted Scott's motion for leave to proceed in forma pauperis and required he pay an initial filing fee. Doc. 12. Scott timely paid his initial filing fee. Scott filed motions to appoint counsel, Docs. 3, 17, and 18, and motions for a preliminary injunction, Docs. 16 and 18. Scott also filed an amended complaint, Doc. 20, and several declarations and supplements, Docs. 1-1, 1-2, 5, 6, 9, 11, 13, 14, 15, 18, 18-1, 19, 19-1, 21, 21-1, 22, 22-1, 23, 23-1, 24, 24-1, 25, and 26. This Court now screens Scott's amended complaint and supplements under 28 U.S.C. §§ 1915 and 1915A.

I.      **1915A Screening of Amended Complaint**

A.      **Factual Background Alleged by Scott**

Scott has been incarcerated at the SDSP since May 2011. Doc. 6 at 1. At times relevant, he was housed in East Hall of the SDSP. Doc. 1-1 at 27. Construing Scott's complaint liberally, he alleges several claims against prison officials at the SDSP. Scott filed several grievances with prison staff, and he filed copies of the grievances with this Court. See generally id. He alleges that these grievances state his claims against defendants. See generally Doc. 1.

1.      **Epilepsy**

On October 29, 2022, Scott suffered a forty-five-minute seizure while incarcerated at the SDSP because he was denied his necessary hypertension medications: Lisinopril and Hydrochlorothiazide (HCTZ).[3] Doc. 20 ¶¶ 28, 39; Doc. 21-1 at 15–21. High blood pressure is a stressor for Scott's epilepsy. Doc. 1-1 at 5; Doc. 1-2 at 9; Doc. 20 ¶ 28. Scott was rushed from the Special Housing Unit (SHU) to Avera McKennan Hospital in Sioux Falls, South Dakota. Doc. 20 ¶ 28.

On June 9, 2023, Scott requested an increased dosage of his prescription of Keppra, an anti-seizure medication. Doc. 6 at 1. On June 12, 2023, Scott went to medical to receive his prescriptions: 40 mg of Lisinopril, 25 mg of HCTZ, and 500 mg of Keppra. Id.; Doc. 1-1 at 5, 34, 63, 66, 86, 89. Lisinopril and HCTZ are medications that he claims he was allowed to keep on his person (KOP). Doc. 1-1 at 15. Scott left medical and went to the chow hall to eat breakfast. Doc. 6 at 1. After breakfast, he returned to his cell in East Hall. Id. Sergeant Padilla met Scott at his cell and ordered him to cuff up. Id. Scott was placed in the East Hall holding cell and was tacked

---

[3] This Court is familiar with the facts of Scott's October 29, 2022, seizure because those facts are the basis for Scott's other civil lawsuit. See Scott v. Carpenter, 4:23-CV-04020-RAL.

down to a metal bench.  Id.; Doc. 15 at 8; Doc. 20 ¶¶ 28, 46.  Scott claims that he did not know

what he did wrong and was not aware why he was taken to the SHU.[4]  Doc. 6 at 15.

Scott felt stress because bright lights, loud noises, and anxiety are factors that can trigger

seizures.  Id. at 2.  Scott did not have enough time to take his necessary medications before being

placed in the holding cell.  Id. at 1–2.  He had stomach pain and black spots in his vision and felt

light-headed and dizzy.  Id. at 2; Doc. 1-1 at 66; Doc. 20 ¶ 28.  He asked Nurse Sarah to help him

because he felt sick, but she stated that she was "off duty" and ignored his pleas.  Doc. 1-1 at 34,

86; Doc. 1-2 at 8; Doc. 6 at 2; Doc. 15 at 8; Doc. 20 ¶¶ 28, 48.  Scott then reported his symptoms

to Officer Kerouska, but Kerouska ignored him.  Doc. 1-1 at 34, 66; Doc. 1-2 at 8; Doc. 6 at 2;

Doc. 20 ¶ 46.  Scott began kicking on the cell's plexiglass and metal bars to get Kerouska's

attention; she yelled at Scott to stop kicking the bars.  Doc. 1-1 at 34, 66; Doc. 6 at 2; Doc. 20 ¶ 46.

Scott informed her that he left his KOP medication in his cell and that he was feeling ill, but she

walked off and did nothing for Scott.  Doc. 1-1 at 34, 66; Doc. 1-2 at 8; Doc. 6 at 2.  Scott also

saw Officer Elaine Elehrs; he told her that he needed his medication because he was dizzy and had

blind spots in his vision.  Doc. 1-1 at 72; Doc. 6 at 2.  Scott claims that Elehrs yelled at the top of

her lungs that he would receive his medication when he got to the Jameson Annex SHU.  Doc. 1-2

at 8; Doc. 6 at 2.  He also requested to speak with an officer-in-charge, but Elehrs never called

one.  Doc. 6 at 2.  Scott claims that he had a seizure because he was denied his necessary

medications.  Doc. 1-1 at 34, 63, 66, 72; Doc. 1-2 at 8.  Scott alleges that he vomited during his

seizure and was transported via wheelchair to health services; his blood pressure was 150 over 75.

---

[4] Scott later learned that he was sent to the SHU because an inmate reported that Scott threatened
to kill an officer and escape.  Doc. 1-1 at 16, 52, 56, 89; Doc. 6 at 6.  On June 13, 2023, Scott was
informed that the reason he was taken to the Jameson Annex anytime he was in separate housing
was because he was seizure prone and it was necessary for easier navigation for the paramedics
and ambulance.  Doc. 6 at 3; Doc. 20 ¶ 60.

Doc. 1-1 at 34, 66, 86; Doc. 1-2 at 8; Doc. 6 at 3. Padilla was made aware of Scott's seizure and brought his medication. Doc. 1-1 at 34, 86.

After the seizure, Scott was questioned by the health services code red team; they told him that he should have taken his Lisinopril and HCTZ. Id. at 63, 67–70; Doc. 6 at 2. Scott alleges that Nurse Andrew said that it was Scott's fault for the seizure because he did not take his Lisinopril and HCTZ. Doc. 6 at 3. Scott claims that he did not have time to take his prescriptions because he was handcuffed in the early morning, placed in the holding cell, and ignored by Elehrs and Kerouska. Doc. 1-1 at 67. He requested a thorough investigation into the denial of his medication. Id. at 5; Doc. 1-2 at 9. He also requested "for the ADA Coordinator to be notified of these continuous issues with Health Services and [his] medications, that are Necessary and Prescribed by a Doctor or Licensed Physcian [sic]." Doc. 1-1 at 5. His request for the ADA Coordinator to be notified was denied. Id. at 68. Scott claims that as a result of his seizures he has blind spots in his vision and is sensitive to light. Id. at 82. He was prescribed tinted eyeglasses, and he experiences migraines without the glasses. Id.; Doc. 20 ¶ 40; Doc. 21 ¶ 3.

On June 28, 2023, Scott filed a grievance stating that he did not receive his Lisinopril and HCTZ for three-to-four days after release from the SHU.[5] Doc. 1-1 at 3, 15. Health service staff responded to Scott's grievance and informed him that deliveries from pharmacies may take up to ten days, medications may be delayed when transferring between facilities, and prescription refills should be filed twelve days prior to the last dose to prevent missed doses. Id. at 6. Scott claims that Warden Teresa Bittinger stated in her administrative remedy response that Scott received his necessary medication on June 23, 2023, but Scott claims that he did not receive his medication

_____

[5] Scott had previously received a letter from Wasko on January 31, 2023, informing him that Restrictive Housing status should not hinder receiving necessary medications. Doc. 1-1 at 19; Doc. 15 at 11; Doc. 19-1 at 42; Doc. 20 ¶ 31; Doc. 21-1 at 38.

until June 26, 2023. Doc. 1-2 at 7. Scott alleges that his time-stamped envelope shows that he did not receive the medication when Bittinger claims he did. <u>See id.</u> at 7, 14–17.

Scott alleges that between October 3, 2023, through October 7, 2023, he did not receive in a timely manner, or at all, his necessary medications: Lisinopril, HCTZ, and Keppra. Doc. 15 at 5–6; Doc. 19 ¶ 9; Doc. 20 ¶ 28. On October 5, 2023, Rower told Scott that his medications had been lost, and a health services employee told Scott that they would have to order his medication. Doc. 15 at 6; Doc. 19 ¶ 9; Doc. 20 ¶ 32. On October 6, 2023, Scott asked Nurse Alexis for his prescription medications. Doc. 15 at 4. Scott claims that Alexis denied his request, cursed him out, and stated that "her name was 'LaQuesha,' and [was] using a Black Womans [sic] Urban Voice[.]" <u>Id.</u> <u>See</u> <u>also</u> Doc. 19 ¶ 18; Doc. 20 ¶ 31; Doc. 21 ¶ 5. Scott alleges that Alexis is a Caucasian female. Doc. 21 ¶ 5. Scott told Alexis that he was a plaintiff in federal court and that he was documenting everything she said to him. Doc. 15 at 4–5. Scott asked unit staff and officials for a grievance, but they refused. <u>Id.</u> at 5. Scott reported Alexis's conduct to an outside medical provider; Unit Managers Ellis and Hanson were present when Scott reported Alexis for racial comments and verbal abuse. Doc. 20 ¶¶ 34–35. Hanson said that "she does that to everybody." <u>Id.</u> ¶ 35. Scott wrote to Bittinger and ADA Coordinator Melissa Maturan about Alexis's behavior. Doc. 15 at 5. Scott later forgave Alexis for her "insensitive outburst and racial slurs, however it still does not excuse the fact that [he has] known documented chronic health issues" and that his medications were denied and delayed. Doc. 19 ¶ 20. <u>See</u> <u>also</u> Doc. 20 ¶ 31.

On October 7, 2023, Scott told officers and health service staff that he felt dizzy and weird and had blind spots in his vision. Doc. 15 at 6. After lunch time, Scott gave Rower one empty lunch tray through the slot in his cell door. <u>Id.</u> As Scott went to grab his cellmate's tray, Scott had a seizure, fell backwards, and hit the back of his head on the cell's concrete floor. <u>Id.</u>; Doc.

19 ¶ 10.  Scott did not remember what happened during the seizure, but he was told that "Alexis was there cracking jokes and laughing at [him] while [he] was shaking, and her demeanor was festive."  Doc. 15 at 6.

Scott was told by a health services official that his seizure on October 7, 2023, was over an hour-long.  Id. at 7; Doc. 19 ¶ 11; Doc. 19-1 at 37; Doc. 20 ¶¶ 28, 32.  He claims that his seizure was caused by delay and denial of his necessary medications: 40 mg of Lisinopril, 25 mg of HCTZ, and 750 mg of Keppra twice daily.  Doc. 15 at 7; Doc. 18 ¶ 7; Doc. 19 ¶ 11; Doc. 20 ¶ 28.  While housed in the SHU, Scott was only able to receive these medications during medical pass out or from health services staff with a correctional officer present.  Doc. 18 ¶ 11; Doc. 19 ¶ 11; Doc. 20 ¶ 28; Doc. 21 ¶ 2.

Scott was transported by ambulance to Avera McKennan Hospital; Scott's bloodwork detected a lack of his necessary medications in his system.  Doc. 15 at 7; Doc. 19-1 at 9, 36–37; Doc. 20 ¶ 28.  A nurse and Captain Rodriguez told Scott that his blood labs showed that his seizure was caused by low levels of medication in his blood.  Doc. 18 ¶ 10; Doc. 19 ¶ 13; Doc. 19-1 at 36.  Scott's discharge summary stated that his seizure was due to the lack of Keppra in his system.  Doc. 19-1 at 10, 12; Doc. 20 ¶ 28; Doc. 21-1 at 7, 9.  Scott asked officers and health service staff if he could see his hospital discharge summary, but his request was denied.  Doc. 15 at 7; Doc. 19 ¶ 13; Doc. 19-1 at 7, 55; Doc. 21-1 at 1.  Scott claims that he fears for his life because of denial of his necessary medications.  Doc. 15 at 8.

Scott claims that Rower said that Scott "had a fake seizure, wasted tax payers money and time, wasted officers resources, and that [he] should be repremanded [sic] and never let out [of] the [SHU]."  Doc. 18 ¶ 9.  See also Doc. 19 ¶ 12 (alleging that Rower told Scott that he "faked [his] seizure and that [he] should be brain dead after having an hour long seizure."); Doc. 19-1 at

36.  On December 12, 2023, Scott claims that Rower said that "the reason why he cussed [Scott] out was because nobody has an hour long seizure, because they did not get their medications, and because [Scott] told on Nurse Alexis and that [Scott] spilled the beans." Doc. 20 ¶ 32.  Rower also allegedly said that Scott was causing problems instead of laying low; Scott responded that he had epilepsy and cannot control his seizures.  Id.  Scott also said that his discharge summary stated that he had little Keppra in his system because Rower said Scott's medications were lost in transport. Id.

Scott claims that Alexis and another health service employee approached Scott while he was in the shower and asked him to change his story and to recant his statements, because Alexis's boss was asking questions.  Id. ¶ 60; Doc. 21 ¶ 6.  Alexis approached Scott a second time alone and coerced Scott into changing his story.  Doc. 20 ¶ 60; Doc. 21 ¶ 6.  Scott wrote a letter for Alexis "exonerating her for her conduct while [he] was in her medical care of A-Floor Section 6 – Jameson Annex." Doc. 21 ¶ 4.  See also Doc. 20 ¶ 49.  Scott "wrote that letter for Nurse Alexis, as well to keep getting his medications on time and without delay to keep from having a break through seizure, and so he would not get into any more further altercations with corrections officers, or staff." Doc. 21 ¶ 9.  See also Doc. 20 ¶¶ 49, 60 (stating that after Scott wrote the letter for Alexis, she told him that "he would receive all of his necessary medications from now on.").

## 2.    Back Injury

On June 13, 2023, Scott was seen at sick call for his chronic seizures; he claims that he was "not all the way competent in [his] mind" because of his seizure the day prior.  Doc. 1-1 at 58. Officer Haley escorted Scott to sick-call.  Doc. 6 at 3; Doc. 1-1 at 55.  He was "naked and only wearing a green turtle suit, sandles [sic] and handcuffed." Doc. 6 at 3.  Scott claims that Haley got in his face and told him to "sit down or he would lay [Scott] down[.]" Doc. 6 at 4.  Scott claims

that he held up his hands to Haley and said, "white man I am no threat to you, I am handcuffed and naked." Id.  Haley ordered Scott to sit on the exam table, and Scott complied.  Id.  Scott mumbled something under his breath, which Haley interpreted as a threat.  Id.; Doc. 1-1 at 55, 90–91.  Haley grabbed Scott off the bed and called Sergeant Moore on his radio.  Doc. 6 at 4; Doc. 20 ¶ 43.  Moore and Unit Coordinator Robinson responded to Haley's radio, and Moore and Haley grabbed Scott, with Robinson following behind.  Doc. 6 at 4.  Scott claims that he "was protesting [his] innocents [sic] from Mr. Robinson[,]" and he informed the officers that he did not threaten, slime, or touch Haley.  Id.  Moore and Haley applied pressure, pushed, rushed, shoved, and twisted Scott's back; Scott felt and heard something pop in his lower back.  Id. at 4–5; Doc. 1-1 at 55; Doc. 17-1 at 2; Doc. 20 ¶ 43.  Scott had surgery on his back within the year prior to Moore and Haley's use of force.  Doc. 6 at 5.  Scott screamed in pain as he was required to walk up the stairs. Id.  Scott claims that Robinson "failed to stop the altercation and just looked on."  Doc. 15 at 12. See also Doc. 20 ¶ 47.  Scott was placed in a cell and had to calm down to relieve the pain; he informed Moore that something was wrong with his back and that he needed to see a doctor.  Doc. 6 at 5.  Moore told Scott that he had his chance at medical and that he wanted his handcuffs back. Id.; Doc. 1-1 at 43, 84, 91; Doc. 20 ¶ 42; Doc. 21 ¶ 7.  Scott wrapped a bedsheet around his lower back to help relieve the pain.  Doc. 1-1 at 84; Doc. 6 at 5; Doc. 20 ¶ 39.  Scott claims that Haley gave him a writeup (M-4) and his healthcare appointment was terminated.  Doc. 1-1 at 52, 55; Doc. 6 at 6.  Scott later had a hearing for his M-4 and was "found guilty based [on] the evidence presented at the hearing."  Doc. 1-1 at 54, 57, 59.

On June 14, 2023, Scott saw medical for his back.  Id. at 43, 47, 90; Doc. 6 at 5; Doc. 17-1 at 2; Doc. 21 ¶ 7.  The nurse informed Scott that she got in trouble for seeing him but "she had a good heart though."  Doc. 6 at 5.  See also Doc. 1-1 at 47, 84, 90–91; Doc. 15 at 12–13; Doc. 20

¶ 39.  After her examination, the nurse determined that Scott's back was swollen and tense, and she ordered x-rays.  Doc. 1-1 at 43; Doc. 6 at 5.  She determined there was an issue with Scott's lower back (L-4 to L-5).  Doc. 1-1 at 13, 47; Doc. 20 ¶ 39.  Scott claims that Robinson tried to prevent the nurse from doing triage on his back and tried to prevent usage of his abdominal binder and TheraBand.  Doc. 1-1 at 13; Doc. 6 at 5; Doc. 20 ¶ 47.  Scott claims that Moore, Haley, and Robinson's actions also caused a slip disk or herniated disk in his lower back (L-3).  Doc. 20 ¶¶ 36, 43; Doc. 21 ¶ 7.

On July 31, 2023, Scott was seen at AMG Neurosurgery and was recommended physiatry, therapy, medication, or injections for his back flare up.  Doc. 6 at 6; Doc. 6-1 at 2–5.  To ease his pain, it was recommended that Scott have a pillow to place between his legs and an additional mattress.  Doc. 6 at 6; Doc. 6-1 at 2; Doc. 9 at 2.  On August 3, 2023, health services approved physical medicine and rehabilitation.  Doc. 6 at 6.  But Scott claims in a supplement dated August 17, 2023, that "Unit Staff and Officers have refused to give [him] these doctor prescribed orders, that are necessary for [his] recovery/and relief of pain."  Doc. 9 at 2.  Scott also claims that the Americans with Disabilities Act (ADA) Coordinator refused to provide him with the prescribed mattress and extra pillow.  Doc. 15 at 12.  On September 9, 2023, Maturan mailed a letter to Scott explaining that the mattress company was previously closed but had reopened and that it would take two-to-three weeks for his order to be ready.  Doc. 19-1 at 51.

As of January 4, 2024, Scott completed physical therapy for his back injury.  Doc. 21 ¶ 8. Scott was waiting to be seen by a pain specialist for a nerve shot or surgery on his back.  Id.  Scott claims that he now takes two new medications: Meloxicam for body pain and Lamotrigine for mental health.  Doc. 20 ¶ 43; Doc. 21 ¶ 8.  Scott claims that he "suffered from and still does 'mental

and emotion' distress at the same time of his physical injury from the altercation with Lt. Moore, Officer Haley, and Unit Coordinator Robinson on 6/13/2023." Doc. 21 ¶ 8.

### 3.    Access to Chapel Activities

Scott suffered from "urology issues" because of a "supra catheter pubic implacement [sic]" that he had for several years.  Doc. 1-1 at 40.  He alleges that he was removed from the SDSP's Muslim Ramadan list because he could not hold his bladder for over four hours.  Id. at 40.  SDSP's chapel rules prohibited inmates from reentering chapel services once they leave.  Id.  Scott filed grievances alleging a violation of his First Amendment free exercise rights because of the prison policy not allowing him to attend chapel services because of his urology issues.  Id. at 40, 42.  He was removed from the list for approximately twenty-seven days.  Doc. 20 ¶ 57.  He requested to be placed on the Muslim Ramadan list, free from retaliation and harassment, and for the ADA Coordinator to be notified about his request for accommodations.  Doc. 1-1 at 40–42.  Scott was notified that he was placed back on the Muslim Ramadan list and granted an accommodation to return to chapel activities after using the restroom.  Id. at 36–39.

### 4.    Employment

Scott worked in the kitchen at the SDSP and was terminated on June 12, 2023.[6]  Doc. 21-1 at 57.  On August 15, 2022, Scott spoke with Suzanne, an Aramark[7] employee, who informed

---

[6] Scott alleges that he was terminated by Linda, an employee of Aramark, because he reported racial slurs made to him and comments by Sergeant Swygert, Former Warden Dan Sullivan, Warden Ponto, mental health staff, and other prison officials.  Doc. 20 ¶ 51.  Linda allegedly told Scott that "he was the one who was 'being racial,' and that he needed to focus on his lawsuit not work."  Id.  Scott claims that his termination was retaliation for filing complaints, grievances, and lawsuits.  Id.  It is unclear on the face of Scott's complaint if he is alleging that Linda was involved with his termination on June 12, 2023, or October 3, 2023.  See id.; Doc. 21-1 at 57.

[7] Scott sues Aramark and GTL, which are private companies that contracted with the state.  A private entity may be held liable under § 1983 when it acts under color of state law.  Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588, 590 (8th Cir. 2004).  Thus, for the purposes of screening, this Court assumes that Aramark and GTL were acting under color of state law.

Scott that he should have Unit Coordinator William Allen[8] call or email her to employ Scott in the kitchen. Doc. 21-1 at 57. Scott claims that he was treated differently than other inmates because other "[i]nmates have been fired and hired back, or given unit red shirt jobs the same day that they were terminated from the kitchen." Id. See also Doc. 20 ¶ 52. Scott alleges that he was treated differently than other inmates because he filed grievances, complaints, and lawsuits. Doc. 21-1 at 57–58.

Scott does not specify when he was rehired in the SDSP kitchen. See generally Doc. 15. Scott claims that in September 2023, Chef Tanya, an employee of Aramark, made sexual advances toward him. Doc. 19 ¶ 1; Doc. 19-1 at 43–44; Doc. 20 ¶ 50; Doc. 21-1 at 46. He claims that he was cutting cakes at the kitchen workstation when Tanya propositioned him for sexual activity. Doc. 19 ¶ 2; Doc. 19-1 at 43; Doc. 20 ¶ 50. Scott claims that when he and Tanya were introduced he believed that she was trying to help him with his dreams of owning a food truck. Doc. 19 ¶ 2. She helped him become ServSafe certified. Id. Scott had shown Tanya some of his recipes that he typed on prison paper, the name of his future food truck, and menu items to be sold on the food truck. Id. ¶ 3. Scott asked Tanya for her thoughts, opinions, and suggestions about his future food truck and catering business. Id. ¶ 4.

On October 2, 2023, Scott learned that Tanya brought recipes into the prison from a computer outside the institution. Id. ¶ 5; Doc. 15 at 2–3; Doc. 21-1 at 66, 73. Scott claims that he did not ask her for to bring outside recipes. Doc. 19 ¶ 6. On October 3 and 4, 2023, Scott filed a grievance reporting Tanya to Unit Manager Ekeren. Id. ¶¶ 6, 21; Doc. 15 at 2–3; Doc. 18 ¶ 17; Doc. 19-1 at 5, 40; Doc. 20 ¶ 33. Scott reported a Prison Rape Elimination Act (PREA) violation

---

[8] Scott alleges that Allen's conduct violated his constitutional rights, but Allen is not named as a defendant.

against Tanya.  Doc. 20 ¶¶ 29, 50; Doc. 21-1 at 66.  Investigation of Scott's PREA claim found that his allegation was unsubstantiated.  Doc. 19-1 at 46; Doc. 21-1 at 68.  Scott appealed the PREA claim, but Wasko denied his appeal because he did not identify any procedural or policy errors or omissions in the investigation.  Doc. 21-1 at 35, 61, 64–65.  Scott filed several more requests for administrative remedy against Tanya for the same conduct, but they were denied because his claim was already fully investigated.  Id. at 44–45, 64–65.  Scott also reported to officers, unit staff, Bittinger, and Maturan that Tanya had personal and sexual relationships with inmates.  Doc. 15 at 3.  He claims that Tanya wrote letters, sent money, and brought contraband to inmates with whom she had a relationship.  Id.  Scott claims that Tanya "to throw the scent off of her trail . . . told staff that [Scott] asked her for her personal information (her phone number)."  Id. at 3–4.  See also Doc. 19 ¶ 7; Doc. 21-1 at 46.

On October 3, 2023, Scott was terminated from his employment in the SDSP kitchen.  Doc. 16-1 at 1; Doc. 19 ¶ 21.  Scott claims that his termination was wrongful because he was fired for refusing Tanya's advances and that it "seems to be an ongoing campaign of harassment and retaliation[.]"  Doc. 16-1 at 1.  See also Doc. 20 ¶ 29.  Scott claims that he was sent to the SHU for twenty days without a writeup because he filed a grievance reporting Tanya.  Doc. 15 at 2; Doc. 19 ¶ 7; Doc. 19-1 at 9, 39–41, 48–49; Doc. 20 ¶ 31; Doc. 21-1 at 59.  On October 23, 2023, Scott was released from the SHU and still had not received a writeup.  Doc. 19 ¶ 15.  Scott alleges that Tanya was later terminated from Aramark because of investigations and prison policy violations.  Id. ¶ 8.  Scott alleges that he began receiving death threats from "Tanya's boy toy love interest, and their gang member associates."  Doc. 15 at 4.  See also Doc. 18 ¶ 1.  Scott claims that he fears for his life because "he revealed Chef Tanya[']s agenda[.]"  Doc. 15 at 8.  See also Doc.

16 at 8. Scott sent kites to Bittinger, Maturan, mental health officials, officers, and unit staff alerting them of his substantial risk of serious harm and death threats. Doc. 18 ¶ 4.

###### 5.    Retaliation and Discrimination

During his multiple times in the SHU, Scott did not have access to a law library, a computer, a tablet, a kiosk, a phone, a copy machine, writing paper, extra ink for his pen, the court, or his disability rights advocate, Devin Labbee-Darling. Doc. 1-1 at 56, 63–64; Doc. 6 at 6; Doc. 15 at 2; Doc. 16 at 2; Doc. 18 ¶ 3; Doc. 19 ¶ 22; Doc. 19-1 at 6; Doc. 20 ¶ 29. Scott learned that he was sent to the SHU in June 2023 because a random inmate told an officer that Scott planned to kill an officer and escape. Doc. 1-1 at 16, 52, 56, 89; Doc. 6 at 6. Scott claims that the report was later found to be false and the charges were dropped. Doc. 1-1 at 16, 56. He claims that a special security officer admitted to Scott that the officer knew Scott was innocent but that this process would happen again for future false reports. Id. at 64, 90.

Scott alleges that he has "been subjected to a campaign of harassment and an onslaught of retaliation" by officers, unit-staff, Maturan, Unit Coordinator Pechous, Alexis, Tanya, Aramark, and Bittinger. Doc. 15 at 1–2. Scott claims that he was retaliated against and harassed for exercising his First Amendment rights by filing grievances, complaints, and lawsuits against prison officials. Doc. 18 ¶¶ 1–2, 8; Doc. 21 ¶ 7; Doc. 21-1 at 40–41; Doc. 23 ¶ 5; Doc. 26 ¶ 8. Scott alleges that his grievances are rejected depending on what issues he alleged, how inflammatory the grievance was, and what response prison officials chose to give. Doc. 19 ¶ 28. Scott claims that he was in Administrative Segregation and was not "charged with anything, or even given a write (up)., [sic] and violation of any 'Institutional Prison Policies,' he [was] sitting in 'limbo' with only the very basic necessities provided to him." Doc. 18 ¶ 7. Scott alleges that he expressed

his concerns to Bittinger, Associate Warden Johnston, Hanson, Ekeren, Ellis, Yost,[9] Unit

Coordinator Ambrose, Bertsch, special security officials, Allen, Unit Coordinator Sydney, health

services staff and leadership, Avera McKennan doctors, various correctional officers, Maturan,

Labbee-Darling, general counsel for an unspecified institution, and Michael Alston, an employee

of the Department of Justice Civil Rights Office; Scott claims that he only received positive help

from Labbee-Darling and Alston. Doc. 19 ¶ 28.

Scott alleges that he was supposed to be reclassified on September 29, 2023, which would

allow him to be transferred to the Mike Durfee State Prison, but he was not reclassified. Doc. 15

at 4. He has seventeen points, but he was supposed to be dropped to fourteen points, which would

make him eligible to be moved to the Mike Durfee State Prison. Doc. 16 at 7–8; Doc. 18 ¶ 15.

Scott asked Maturan if he could be moved to the Mike Durfee State Prison, so that he could avoid

the unfair treatment at the SDSP. Doc. 24-1 at 6. Maturan responded to Scott's kite and informed

him that he could not be moved because he had a medical hold. Id. at 7.

On February 17, 2024, Scott and his cellmate were told to exit their cell for a shakedown

and cell search. Doc. 25 at 1; Doc. 26 ¶¶ 1–2. Scott's cellmate complied, but Scott wanted to

place his legal materials aside before exiting the cell. Doc. 26 ¶ 2. Corporal Perry[10] asked Scott

what he was writing about, and Scott replied that he did nothing wrong and that he would

appreciate if they stopped harassing him for doing his legal work. Id. ¶ 3. Perry asked Scott if he

wanted to go to segregation, which Scott alleges was a violation of SDSP's ethics policy. Id. "On

the way to the holding cell [Scott] told Officer Parker that CPL. Perry was shaking his cell down

for no reason." Id. On February 23, 2024, Haley told Scott that he was the reason that the SDSP

---

[9] Scott alleges that Yost's conduct violated his constitutional rights, but Yost is not named as a
defendant.
[10] Scott alleges that Perry was harassing him, but Perry is not a named defendant. Doc. 26 ¶ 3.

was on lockdown, and Haley "pointed his finger at [Scott] as if it were a gun and he shot at [Scott]." Id. ¶ 4. See also Doc. 25 at 1–2.

### 6.   Officer Van Blair Com

Scott claims that on May 28, 2023, at 5:35 p.m., Officer Van Blair Com[11] reached into Scott's cell and flipped him off.  Doc. 1-1 at 27, 30, 71.  He also alleges that it looked like Van Blair Com tried to plant something in Scott's cell, but Van Blair Com told Scott to not worry about it.  Id. at 28, 71.  At 6:11 p.m., Van Blair Com staggered in "some sort of his version of an 'Urban walk' " past Scott's cell.  Id. at 1, 27, 30.  When Scott asked Van Blair Com what he was doing, Van Blair Com said that "he was walking like an Old Black Man."  Id. at 1, 28.  See also Doc. 20 ¶ 45.  Scott and his cellmate reported Van Blair Com.  Doc. 1-1 at 1, 27.  Scott claims that Van Blair Com's actions violate prison policy because they were harassment and retaliation.  Id. at 1, 11, 27–28.  Scott went to Officer Drayton to report Van Blair Com, but before he could mention anything Drayton said, "What did Officer Van Clair Com do now?"  Id. at 1, 11, 27.  Drayton advised Scott to talk to the officer in charge.  Id. at 1.  At 10:00 p.m., Van Blair Com came to Scott's cell to question him, but Scott said that he could not talk because he was a plaintiff and pro se litigant.  Id. at 1, 28.  Scott alleges that the interaction with Van Blair Com was recorded on camera.  Id. at 11.  He filed a grievance requesting to view the footage.  Id.

On July 1, 2023, at 6:05 p.m., Van Blair Com ordered Scott to go through a metal detector to get to medical and chow; Scott claims that Van Blair Com threw a magazine in his direction as he attempted to go through the metal detector.  Id. at 32–33; Doc. 1-2 at 11; Doc. 20 ¶ 45.  Scott has a metal knee, two-plates and nine pins in his ankle, and metal hardware in his lower back (L-

---

[11] Scott refers to the defendant as Officer Van Blair Com and Officer Van Clair Com throughout his complaint.  Because Scott spells the defendant's name as Van Blair Com in the caption, this Court will refer to the defendant as Van Blair Com.  See Doc. 1 at 1.

4 to L-5). Doc. 1-1 at 32; Doc. 1-2 at 11. Scott alleges that Van Blair Com screamed at Scott that he "needed to keep going back through the metal detector until it stops going off, or go to the holding cell and get strip searched." Id. at 32–33; Doc. 1-2 at 11–12. Scott asked other officers to "get this officer, because he was out of control." Doc. 1-1 at 33; Doc. 1-2 at 12. Scott asked Van Blair Com for his name, and Van Blair Com stated that "you know my name Scott, because you wrote a grievance against me." Doc. 1-1 at 33; Doc. 1-2 at 12. See also Doc. 20 ¶ 45. Scott claims that he told the other officers that "you heard what he said and that that was retaliation and a campaign of harassment." Doc. 1-1 at 33; Doc. 1-2 at 12.

Scott filed a declaration from his cellmate, who alleges that on July 8, 2023, Van Blair Com asked the cellmate if he knew that Scott was suing Van Blair Com. Doc. 1-1 at 31. The cellmate replied no but said that he would ask Scott. Id. The cellmate claims that he felt that Van Blair Com was trying to send a threatening message through him to Scott. Id.

Scott alleges that he was being treated unfairly and racially discriminated against by officers, unit staff, and prison officials. Id. at 11, 33. Scott claims that he reported Van Blair Com to Drayton, Haley, Corporal Schmidt, Rower, and Officer Miagel; he filed a grievance about Van Blair Com's behavior. Id. at 1, 28. Scott alleges that he was afraid of what Van Blair Com might do to him in retaliation; he was "traumatized and in fear of what he might say and do to [him] next." Id. at 7–8; Doc. 1-2 at 6. He claims that Van Blair Com has demonstrated aggressive behavior toward other inmates at the SDSP and that Van Blair Com's behavior violates prison policies. Doc. 1-1 at 1, 7–8, 33. Scott documented Van Blair Com's behavior by filing grievances and verbally by reporting him to his supervisors and unit staff. Id. at 7–10.

### 7.    Loss of Property

Scott claims that prior to one of his stays in the SHU he had ordered two pizzas from Pizza Ranch, totaling $25.20.  Id. at 16, 50, 53, 64, 90; Doc. 6 at 4, 6.  He filed grievances requesting that his account be refunded for the pizzas because he did not receive them while in the SHU.  Doc. 1-1 at 16, 50.  Allen issued an official response to Scott's grievances informing Scott that he would not receive a refund because he was sent to the SHU for disciplinary issues.[12]  Id. at 49.

On June 13, 2023, Scott saw Robinson washing his face in the bathroom.  Doc. 6 at 4. Scott claims that he respectfully requested Robinson to cancel the pizza order Scott had placed prior to entering the SHU.  Id.  He also requested Robinson to give him back his kite that had the name of his disability rights advocate, Labbee-Darling.  Id.  Robinson gave a long pause and then said he would take care of it.  Id.

On June 20, 2023, Scott lost his "gainful employment, and Earned Discharge Credits[.]" Doc. 1-1 at 56.  Scott was hired in the kitchen, but in October 2023, he was terminated and not allowed to obtain Earned Discharge Credits.  Doc. 19 ¶ 21.  Scott alleges that he was charged with prison policy violations, which he was cleared of, but "Bittinger and Prison Officials refuse to give [him] the opportunity to become gainfully employed to create a speedier release date[.]"  Doc. 20 ¶ 29.

On October 16, 2023, Scott learned that he had over $400[13] worth of phone time stolen from his tablet while he was in the SHU.  Doc. 19 ¶ 14; Doc. 19-1 at 8, 39, 41, 45, 48; Doc. 20 ¶ 29; Doc. 21-1 at 59.  Hanson told Scott to file a grievance and that he would consult Major

---

[12] Scott had a care package ordered on October 4, 2023, refunded when he was in the SHU.  Doc. 19 ¶ 28; Doc. 19-1 at 1.
[13] Scott alleges that the time stolen was over $430, but he also alleges that the amount was $428 and $418.82.  Doc. 19 ¶ 14; Doc. 19-1 at 8, 39, 41, 45, 48; Doc. 20 ¶ 29; Doc. 21-1 at 60.

Jeannie Bertsch for a full refund of Scott's phone time; Scott filed a grievance about his missing time.[14] Doc. 19 ¶ 14; Doc. 19-1 at 45; Doc. 20 ¶ 36. He reported the missing time to Hanson, Unit Coordinator Ambrose, officers, and Case Manager Yost; Scott claims that Yost took responsibility for catching offenders using Scott's tablet. Doc. 19-1 at 45.

Scott claims that while he was in the SHU, his former cellmate passed around Scott's tablet to support his drug habit. Doc. 19 ¶ 15. On April 1, 2022, Global Tel* Link (GTL) sent a memo requiring all inmates to change their tablet pin number to their inmate number and their date of birth. Doc. 20 ¶ 30. Scott claims that his former cellmate was able to use his tablet because his pin number was printed on his photo identification as required by unit staff. Id.

Multiple offenders were photographed using Scott's tablet, but one indigent inmate took the blame. Doc. 19 ¶ 27; Doc. 19-1 at 8; Doc. 21-1 at 34. Scott alleges that Wasko informed him that his former cellmate took Scott's tablet, but other inmates also used the tablet. Doc. 21-1 at 34; Doc. 22-1 at 13. Bittinger responded to Scott's grievances and informed Scott that he would not be reimbursed. Doc. 21-1 at 50. Bittinger wrote that staff properly packed up Scott's property but Scott's cellmate deceived security staff and kept the tablet; Bittinger denied Scott's request for a refund because "[u]ltimately $418.82 was taken because of theft. Staff negligence was not the reason for the theft and therefore, [Scott] will not be refunded." Doc. 21-1 at 50, 62; Doc. 22-1 at 11. Scott claims that he "was told by Unit Staff and Prison Officials to take the loss, or take us to Court." Doc. 19 ¶ 27.

Scott claims that his former cellmate stole most of Scott's "bought personal property" and sold the following items: hot pot, audio cord, audio adaptor, extension cord, headphones, earbuds,

---

[14] Scott alleges that the only grievance he was allowed to write in the SHU was for his missing phone time. Doc. 19 ¶ 17. He claims that he was not allowed to write any other grievances. Id.

shower clogs, sweatshirt, sweatpants, hygiene, commissary food, and padlock.  Id. ¶¶ 15, 21; Doc. 19-1 at 41, 57–58; Doc. 20 ¶ 29; Doc. 21-1 at 32–33, 60, 70–71.  Scott's nineteen-inch television was also broken.  Doc. 19 ¶ 21.  Scott claims that officers and unit staff, including Ekeren, failed to pack up his property and secure it for a day-and-a-half.  Id.; Doc. 20 ¶¶ 29, 33; Doc. 21-1 at 32–33.  Officer Paw[15] packed up Scott's cell and completed an inmate living quarters personal property inventory.  Doc. 22-1 at 8.

On November 27 or 28, 2023, Scott claims that Johnston stated to him that " 'if officers and unit staff failed to promptly pack up your old cell #222., [sic] let alone a day and a half then we owe you money.'  He also said that he needs to consult with the accounting department and General Counsel[.]"  Doc. 20 ¶ 30.  See also Doc. 21-1 at 41–42, 47; Doc. 22-1 at 12.  On November 30, 2023, Senior Department of Corrections Official Doug Clark told Scott that because he "filed a lawsuit against the Department of Corrections that there's nothing he can do for [Scott] and that he probably should not be talking to [Scott] in regards to the racial discrimination, phone time, property, retaliation, or anything else related to [Scott's] civil cases."  Doc. 20 ¶ 30.  Scott filed a small claims lawsuit against Bittinger over the theft of his property.  Id. ¶ 29; Doc. 21-1 at 39.  Before Scott filed his action in small claims court, he wrote to the South Dakota Attorney General Counsel and in-house general counsel, and Scott spoke with Maturan, Ellis, Johnston, Allen, and Unit Coordinator Nicole Mayer.  Doc. 22 ¶ 8.  Scott claims that Bittinger and another prison official attempted to speak with him, but he informed her that "he could not speak with her and only through her counsel, and or the court[']s order . . . [and Bittinger] replied oh yes! yes!

---

[15] Although Scott alleges that Paw was involved in deprivation of his property, Paw is not named as a defendant.

you are right." Doc. 20 ¶ 58.  Scott claims that he has endured further retaliation and harassment after his conversation with Bittinger.  Id.

Scott claims that he has been treated differently than similarly situated inmates.  Id. ¶ 31; Doc. 19 ¶ 18; Doc. 21-1 at 28, 41; Doc. 22 ¶ 16.  Another inmate, Ryan Duffy, had his property previously stolen in a similar manner.  Doc. 20 ¶ 29.  Scott wrote a grievance and appeal for Duffy, and Duffy received a loaner twenty-four-inch color television and a remote control.  Id.; Doc. 21-1 at 28.  Scott claims that Mayer was instrumental in getting Duffy's loaner television.  Doc. 22 ¶ 15. On December 19, 2023, Johnston told Scott that "giving [him] back [his] stolen phone time of $418.82 – and stolen property that was stolen from [Scott] would set a precedence."  Doc. 21-1 at 28.  On December 20, 2023, Johnston gave Duffy a brand new twenty-four-inch color television. Id. at 28, 41; Doc. 20 ¶ 29.  Scott claims that Duffy is Caucasian and favored by officers, unit staff, and prison officials.  Doc. 20 ¶ 29.  Scott is African American.  Id.  Scott alleges that Ellis and Mayer were instrumental in helping Duffy get a television.  Id. ¶¶ 34, 37.  Scott alleges that he filed a similar grievance for his stolen property, but he has "received absolutely Nothing from Prison Officials, even after being (TOLD) that [he] would be fully re-funded."  Id. ¶ 29.  Scott claims that Ekeren, Hanson, and Bertsch told Scott that he would be refunded for the failure of unit staff to pack up his property for a day-and-a-half, but they later refused to reimburse Scott because "their staff are not responsible for anything."  Doc. 19 ¶ 24.  See also Doc. 20 ¶ 29.  Scott claims that Ellis challenged Scott to find a policy that relates to his issue of reimbursement, and Scott cites the South Dakota Department of Corrections Staff Code of Ethics 1.1.C.1.  Doc. 19 ¶¶ 24–26; Doc. 19-1 at 2–3.

### 8.    Access to the Courts and Right to Send and Receive Mail

Scott claims that several defendants have made it difficult to pursue his claims.  Doc. 6 at 6; Doc. 19 ¶ 22.  He alleges that "Prison Officials have tried to silence him, through intimidation, by not letting [him] have access to make legal copies for the courts or timely legal mailouts, tampering with privileged legal mail, not letting him file timely grievances to the point when he has to go . . . to their supervisors." Doc. 23 ¶ 5.  He claims that Allen and Mayer have not allowed access to the courts and have limited Scott's right to file grievances, complaints, and lawsuits. Doc. 22 ¶ 12.  He claims that Allen has made it difficult for him to obtain financial records to file his claims.  Doc. 6 at 7; Doc. 9 at 1.  In order to receive his prison trust account report to pursue his case, Scott contacted Rodriguez, Allen, Ekeren, Pechous, Grace, interns, Maturan, and Labbee-Darling.  Doc. 9 at 1.  Scott claims that he exhausted all forms of grievance procedures.  Id.  He claims that Allen only provided Scott a copy of his prison trust account report upon receiving this Court's order requiring Scott to submit a prisoner trust account report.  Id. at 2; Doc. 13 ¶ 2.  He claims that Hanson refused to give him grievances, an ink pen, writing paper, and envelopes until Scott told Hanson that he was violating Scott's rights.  Doc. 20 ¶ 35.  He also claims that Pechous has refused to give him grievances, legal copies, access to the court, and access to mail legal documents.  Doc. 6 at 7; Doc. 9 at 1–2; Doc. 13 ¶ 2; Doc. 15 at 12; Doc. 19 ¶ 22.  Scott claims that Pechous refused his request for mail but offered her services to other inmates.  Doc. 9 at 2.  Scott also claims that Pechous forbade other unit coordinators from assisting him.  Doc. 15 at 12.  Scott alleges that he has to choose to spend his money to eat or buy postage stamps to stay in contact with the courts.  Doc. 9 at 2; Doc. 19-1 at 48.

On December 14 or 15, 2023, Scott prepared a manila envelope marked "privileged legal mail" addressed to the Minnehaha County Clerk of Courts.  Doc. 22 ¶¶ 2, 4–5.  The mailing related

to Scott's small claims action and included the following: (1) written statement describing the loss or damage, (2) supporting documentation for the amount he was seeking, (3) correct spelling of the defendants' names in his small claims case and their current addresses, (4) filing fee of $35.98, (5) case filing statements, and (6) affidavit of non-military status.  Id.  Scott handed Corrections Officer Parker the opened envelope to give to Mayer to be mailed.  Id. ¶¶ 2, 4.  Scott's cell is next to Mayer's office; he saw Parker hand the opened envelope to Mayer, who said that she would take care of it.  Id. ¶¶ 2–3.  On December 18, 2023, the fee of $35.98 was taken out of Scott's prisoner spending account.[16]  Id. ¶ 6; Doc. 23-1 at 7; Doc. 26 ¶ 5.  On January 4, 2024, Scott spoke with employees at the Minnehaha County Clerk's Office, who informed Scott that there was no filing fee included in his mailing.  Doc. 22 ¶ 7; Doc. 22-1 at 2; Doc. 23-1 at 3.  Scott claims he attempted to file a grievance about his filing fee, but Mayer yelled at Scott that he could not file a grievance about the disappearance of his filing fee for his small claims court case and that "he was creating more work for her and lots of problems."  Doc. 22 ¶ 9.  Scott wrote to Maturan, the mail room supervisor, and the inmate accounts supervisor about his small claims court filing fee.  Id. ¶ 10; Doc. 22-1 at 3–5.  The inmates account supervisor informed Scott that she could not verify if his check cleared the bank for four-to-six weeks.  Doc. 22 ¶ 11; Doc. 22-1 at 7.  Scott claims that his mother had to mail a money order for his court documents to the Minnehaha County Clerk's Office.  Doc. 23 ¶ 8.

On January 16, 2024, Scott went to Mayer's office and asked her to sign his grievance form and investigate his claims; Scott reminded Mayer that her supervisor, Maturan, ordered her to do so.  Id. ¶¶ 1–2.  Mayer handed Scott back his unsigned grievance form and allegedly screamed at

---

[16] Scott also alleges that on December 18, 2023, an officer verbally abused, slammed doors on him, and thew books at him.  Doc. 26 ¶ 5.  But Scott does not identify who the officer was.  Id.

him to stay out of her office. Id. ¶ 1. Scott claims that on January 18, 2024, Mayer tried to get him to agree to a $10.00 stop payment charge for the check for Scott's small claims filing fee. Id. ¶ 3; Doc. 23-1 at 2, 4, 10–11. But a stop payment was issued for the check without requiring Scott to pay the stop payment fee. Doc. 24-1 at 3.

On February 1, 2024, Scott spoke with Rodriguez and Hanson about his missing $35.98 check from his legal mail. Doc. 24 ¶ 2. Hanson told Scott that he would investigate the matter and informed Scott that he was not receiving Scott's kites because mailroom officials were intercepting Scott's correspondence. Id. On the same day, Scott's step-father, Ramsey Ross, called the Minnehaha County Clerk's Office and was informed that the small claims court was expecting his money order to get the case started. Id. ¶ 3. Also on February 1, 2024, Mayer refused to accept Scott's legal mail, which included a $30.00 check for the small claims court. Id. ¶ 4. He claims that Mayer verbally abused him. Id. Mayer accepted Scott's legal mail after he stated that she could not deny his First Amendment right to access the courts. Id.

On February 6, 2024, Scott asked an inmate to get large manila legal envelopes. Id. ¶ 5. Mayer gave the other inmate small white envelopes, which Scott claims were the wrong envelopes. Id. Approximately five minutes later, Scott asked Mayer for the correct envelopes. Id. Scott claims that Mayer became infuriated when she learned that the envelopes were for him and refused the request. Id. Scott alleges that she cursed at him and refused him the envelopes, copies, and any further legal mailings. Id. Mayer told Scott to go to Allen not her. Id. Scott claims that Allen is the reason he is able to mail legal filings to this Court. Id. ¶ 6. On February 12, 2024, around 4:45 p.m., Allen gave Scott his mail from this Court regarding another pending civil case, Scott v. Carpenter, 4:23-CV-04020-RAL. Doc. 24 ¶ 1. Scott alleges that his legal mail has been missing, delayed, or tampered with. Id.

9.      **General Requests for Relief**

Scott sues all defendants in their individual and official capacities.  Doc. 20 ¶ 27.  He requests declaratory relief asserting that the acts and omissions alleged in his complaint violated his rights under the Constitution and laws of the United States.  Id. ¶ 62; Doc. 22 ¶18.  He requests preliminary and permanent injunctive relief ordering defendants to stop the following behaviors toward him: (1) racism, (2) systemic deliberate indifference to his medical needs, (3) retaliation, (4) harassment, (5) different treatment compared to same or similarly situated inmates, (6) racial taunts, (7) name-calling, and (8) attempts to convince him that "its [sic] all in his head and that the defendants have do [sic] nothing wrong[.]"  Doc. 20 ¶¶ 63–64.  He also requests the following relief: (1) his medication be given to him on time and without delay, (2) permission to attend "Ramadan Muslim Services" without worry of being removed from the attendance list because he had to use the bathroom, (3) employment to receive Earned Discharge Credits (EDCs), (4) refund of $418.82 of phone time, and (5) return of his personal property stolen on October 3, 2023.  Id. ¶ 64.  Scott "want[s] the 'systemic corruption' to stop and [his] complaints falling unto deaf ears and slow-footed responses.  Please stop immediately any and all violations of [his] Constitutional Rights stated therein th[e] complaint."  Id.  He asks for compensatory damages of $50,000 from each defendant jointly and severally.  Id. ¶ 65.  He requests punitive damages of $50,000 from each defendant.  Id. ¶ 66.  He also asks for his costs for the suit and any additional relief that this Court deems just.  Id. ¶¶ 68–69.

B.      **Legal Standard**

A court when screening under § 1915A must assume as true all facts well pleaded in the complaint.  Est. of Rosenberg v. Crandell, 56 F.3d 35, 36 (8th Cir. 1995).  Pro se and civil rights complaints must be liberally construed.  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam);

Bediako v. Stein Mart, Inc., 354 F.3d 835, 839 (8th Cir. 2004) (citation omitted). Even with this construction, "a *pro se* complaint must contain specific facts supporting its conclusions." Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (citation omitted); see also Ellis v. City of Minneapolis, 518 F. App'x 502, 504 (8th Cir. 2013) (per curiam) (citation omitted). Civil rights complaints cannot be merely conclusory. Davis v. Hall, 992 F.2d 151, 152 (8th Cir. 1993) (per curiam) (citation omitted); Parker v. Porter, 221 F. App'x 481, 482 (8th Cir. 2007) (per curiam) (citations omitted).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted). If a complaint does not contain these bare essentials, dismissal is appropriate. See Beavers v. Lockhart, 755 F.2d 657, 663 (8th Cir. 1985) (citation omitted). Twombly requires that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true[.]" 550 U.S. at 555 (internal citation omitted); see also Abdullah v. Minnesota, 261 F. App'x 926, 927 (8th Cir. 2008) (noting that a complaint "must contain either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory" (citing Twombly, 550 U.S. at 553–63)). Further, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 556). Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they "(1) [are] frivolous, malicious, or fail[] to state a claim upon which relief

may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### C.   Legal Analysis

#### 1.   Official Capacity Claims for Money Damages

Scott brings claims against all defendants in their official capacities for money damages. Doc. 20 ¶¶ 27, 65–66. All defendants are employees of or contract with the State of South Dakota. See generally id. As the Supreme Court of the United States has stated, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. Id. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties, . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." Id. at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. Id. But when an official capacity claim is asserted for injunctive relief against a state officer, the defense of qualified immunity does not apply. See Pearson v. Callahan, 555 U.S. 223, 242–43 (2009) (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)). Here, Scott seeks both money damages and injunctive relief. Doc. 20 ¶¶ 62–66. The State of South Dakota has not waived its sovereign immunity. Thus, Scott's claims against all defendants in their official capacities for money damages are dismissed without prejudice under 28 U.S.C §§ 1915(e)(2)(B)(iii) and 1915A(b)(2).

### 2.   Official Capacity Claims for Injunctive Relief and Individual Capacity Claims

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

> Thus, each Government official . . . is only liable for his or her own misconduct. As we have held, a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.

Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (cleaned up).  Scott's individual capacity claims must allege that each individual defendant either directly participated in the unconstitutional conduct or caused the conduct to occur through a failure to train or supervise the offending actor. See id.

#### a.   First Amendment

##### (i)   Free Exercise

Scott alleges that defendants violated his free exercise rights under the First Amendment. Doc. 20 ¶ 57.  Because Scott does not specify who he brings his First Amendment free exercise claim against, this Court construes Scott's complaint as bringing this claim against all defendants. See Doc. 1-1 at 36–42.  In order to state a First Amendment free exercise claim, Scott must allege facts showing that prison officials have substantially burdened the free exercise of his religion. Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir. 2008).  Substantially burdening the free exercise of religion means that the defendants' actions

> must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 988 (8th Cir. 2004) (cleaned up).

Here, Scott alleges that he was removed from the Muslim Ramadan list because his urology issues prevented him from holding his bladder for three-to-four hours to attend the services. Doc. 1-1 at 40–42. Scott does not allege any particular defendant engaged in particular conduct that substantially burdened his free exercise of religion. See id. He also does not allege that he has been prevented from freely exercising his religion. Id. Scott also alleges that he has since been placed back on the Muslim Ramadan list. Id. at 36–39. Because Scott has not alleged facts showing that defendants substantially burdened his free exercise of religion, Scott's First Amendment free exercise claim against all defendants in their individual and official capacities is dismissed without prejudice for failure to state a claim upon which relief can be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### (ii)   Establishment Clause

Scott alleges that defendants violated his rights under the First Amendment Establishment Clause. Doc. 20 ¶ 57. "[A]t a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise[.]" Lee v. Weisman, 505 U.S. 577, 587 (1992) (citing Lynch v. Donnelly, 465 U.S. 668, 678 (1984)). In order to have standing to bring an Establishment Clause claim, a plaintiff may either have standing as a taxpayer or establish "an injury of direct and unwelcome personal contact with the alleged establishment of religion." Patel, 515 F.3d at 816 (citations and internal quotation omitted). "Prisoners may establish an injury if they 'allege they altered their behavior and had direct, offensive, and alienating contact with' a government-funded religious program." Id. at 817 (quoting Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc., 509 F.3d 406, 419 (8th Cir. 2007)).

29

Here, Scott does not allege that prison staff are coercing him to support or participate in religion or its exercise. See Lee, 505 U.S. at 587; Doc. 20 ¶ 57. Scott alleges that he was removed from the Muslim Ramadan list because of his individual health troubles. Doc. 20 ¶ 57. Scott also alleges that he has been granted an accommodation, which allows him to use the bathroom and return to services. Doc. 1-1 at 36–39. Thus, Scott's claim against defendants in their individual and official capacities for violating his rights under the First Amendment Establishment Clause is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### (iii)    Retaliation

Scott alleges that defendants violated his First Amendment right to be free from retaliation. Doc. 20 ¶ 56. To allege a First Amendment retaliation claim, a plaintiff must "show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Spencer v. Jackson Cnty., 738 F.3d 907, 911 (8th Cir. 2013) (quoting Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004)). "[T]he plaintiff must show the official took the adverse action because the plaintiff engaged in the protected [activity]." Revels, 382 F.3d at 876. "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994)).

Scott alleges facts which if true appear to be sufficient to state a claim for First Amendment retaliation. He alleges that he has been retaliated against for filing grievances, a PREA claim, and a lawsuit. See Doc. 1-1 at 16, 52, 56, 64, 90; Doc. 1-2 at 12; Doc. 15 at 2; Doc. 16 at 1–2; Doc. 18 ¶¶ 1–2, 7, 8; Doc. 19 ¶ 28; Doc. 19-1 at 2; Doc. 20 ¶¶ 29, 51, 58; Doc. 21 ¶ 7; Doc. 21-1 at 40–

41, 46; Doc. 23 ¶ 4; Doc. 26 ¶ 8.  Grievances, PREA complaints, and lawsuits are protected First

Amendment activities.  Jacks, 486 F.3d at 1029 (citing Dixon, 38 F.3d at 379); Haynes v.

Stephenson, 588 F.3d 1152, 1155–56 (8th Cir. 2009).

He alleges that he has been denied employment, costing him opportunities to receive

Earned Discharge Credits.  Doc. 1-1 at 56; Doc. 19 ¶ 21.  Scott also alleges that he was placed in

the SHU for twenty days because he reported Tanya.  Doc. 15 at 2; Doc. 19 ¶ 7; Doc. 19-1 at 9,

39–41, 48–49; Doc. 20 ¶ 31; Doc. 21-1 at 59.  "[A]n act in retaliation for the exercise of a

constitutionally protected right is actionable under [§] 1983 even if the act, when taken for a

different reason, would have been proper."  Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir.

1990) (quoting Freeman v. Blair, 793 F.2d 166, 178 (8th Cir. 1986), vacated on other grounds, 483

U.S. 1014 (1987)).  Thus, Scott alleges that he engaged in protected activities, that defendants took

adverse action against him that would chill a person of ordinary firmness from further engaging in

those activities, and that the adverse action was motivated at least in part by his engaging in

protected activities.  See Doc. 1-1 at 56; Doc. 15 at 2; Doc. 19 ¶¶ 7, 21; Doc. 19-1 at 9, 39–41,

48–49; Doc. 20 ¶ 31; Doc. 21-1 at 59.

Under Parrish, Scott must allege that each individual defendant either directly participated

in the unconstitutional conduct or caused it to occur through a failure to train or supervise.  594

F.3d at 1001.  Scott alleges that Bittinger "demonstrated acts of retaliation on [him] for filing

grievances, complaints, and lawsuits."  Doc. 20 ¶ 29.  Scott alleges that Ekeren sent him to the

SHU after he filed a PREA complaint against Tanya.  Id. ¶ 33.  Scott alleges that Tanya had him

sent to the SHU after he refused her sexual advances and reported her conduct in a grievance and

a PREA complaint.  Id. ¶ 50. Scott claims that Linda "was instrumental in the termination of [him

from the kitchen] when he reported the 'racial slurs' made to him and the comments of Sgt.

Swygert[.]" Id. ¶ 51.  Scott also alleges that he has "been subjected to a campaign of harassment and an onslaught of retaliation by: officers, unit-staff, the ADA-coordinator Melissa Maturan, Unit Coordinator Pechous, Health Services Staff member Alexis, 'Chef Tanya', and the Aramark Company.  Also Warden Teresa Bittinger."  Doc. 15 at 1–2.  Thus, Scott's First Amendment retaliation claim against Bittinger, Ekeren, Tanya, Linda, Maturan, Pechous, and Alexis in their individual capacities and against Aramark survives § 1915A screening, and his First Amendment retaliation claim against all other defendants in their individual capacities is dismissed without prejudice.

Scott's First Amendment retaliation claim against defendants in their official capacities for injunctive relief need only allege that each defendant, "by virtue of his [or her] office has some connection" with the unconstitutional policy in question for which Scott seeks injunctive relief. See Ex parte Young, 209 U.S. 123, 157 (1908).  Scott seeks permanent and preliminary injunctive relief ordering defendants to stop retaliating against him.  Doc. 20 ¶¶ 63–64.  Thus, Scott has standing to bring a First Amendment official capacity retaliation claim for injunctive relief.  See Patel, 515 F.3d at 816 (citing Hein v. Freedom from Religion Found, Inc., 551 U.S. 587, 598 (2007)).  Scott's First Amendment retaliation claim against all defendants who are employed by the State of South Dakota in their official capacities for injunctive relief survives § 1915A screening.  Thus, Scott's First Amendment retaliation claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening.

### (iv)   Right to Send and Receive Mail

Scott claims that Pechous and Mayer have not allowed him to send mail. Doc. 6 at 6; Doc. 9 at 1–2; Doc. 13 ¶ 2; Doc. 15 at 12; Doc. 19 ¶ 22; Doc. 22 ¶¶ 2, 4; Doc. 23 ¶ 6; Doc. 24 ¶ 1. Construing his complaint liberally, Scott brings a claim against Pechous and Mayer in their individual and official capacities for violation of his First Amendment right to send and receive mail.

Inmates have a First Amendment right to receive mail. Weiler v. Purkett, 137 F.3d 1047, 1050 (8th Cir. 1998). But that "right may be limited by prison regulations that are reasonably related to legitimate penological interests." Id. In Turner v. Safley, the Supreme Court held that prison rules and restrictions on First Amendment rights are constitutional only "if [they are] reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). The Court in Turner provided four factors to determine whether a prison rule withstands scrutiny:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

Thongvanh v. Thalacker, 17 F.3d 256, 259 (8th Cir. 1994). This Court must give "considerable deference to the determinations of prison administrators who, in the interests of security, regulate the relations between prisoners and the outside world." Thornburgh v. Abbott, 490 U.S. 401, 408 (1989) (citation omitted). Deference is accorded to prison administrators because the realities of running a penal institution are complex, and courts are ill-equipped to deal with problems of prison administration. Jones v. N.C. Prisoners' Lab. Union, Inc., 433 U.S. 119, 136 (1977). As the Supreme Court observed in Turner, "[r]unning a prison is an inordinately difficult undertaking that

requires expertise, planning, and the commitment of resources, all of which are the province of the legislature and executive branches of government." 482 U.S. at 84–85.

Scott has stated sufficient facts to state a claim for deprivation of his First Amendment free speech right to send and receive mail. He alleges that Pechous and Mayer have not allowed him to send mail. Doc. 6 at 6; Doc. 9 at 2; Doc. 13 ¶ 2; Doc. 15 at 12; Doc. 19 ¶ 22; Doc. 22 ¶¶ 2, 4; Doc. 24 ¶ 6. He also alleges that his payment for state court fees was removed from his legal mail. Doc. 22 ¶ 7; Doc. 22-1 at 2; Doc. 23-1 at 3. This Court cannot determine that Scott's First Amendment right to send and receive mail is wholly without merit. Thus, Scott's First Amendment right to send and receive mail claim against Pechous and Mayer in their official capacities for injunctive relief and individual capacities survives § 1915A screening.

### (v)    Right to Access the Courts

Scott alleges that Mayer, Hanson, and Pechous violated his First Amendment right to access the courts. "The Constitution guarantees prisoners a right to access the courts." White v. Kautzky, 494 F.3d 677, 679 (8th Cir. 2007). To succeed on a claim for denial of access to the courts, a plaintiff must show that he suffered actual injury as a result of the defendants' actions. Lewis v. Casey, 518 U.S. 343, 349 (1996). In order to satisfy the actual injury requirement, a plaintiff must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998) (quoting Lewis, 518 U.S. at 353 (footnotes omitted)). The actual injury requirement is a high threshold. Hartsfield v. Nichols, 511 F.3d 826, 831–32 (8th Cir. 2008).

Here, Scott alleges violations of his First Amendment right to access the courts. He claims that Mayer has not allowed access to the courts and has limited Scott's right to file grievances, complaints, and lawsuits. Doc. 22 ¶ 12. He claims that while in the SHU, he did not have access

34

to a law library, a computer, a tablet, a kiosk, a phone, or a copy machine.  Doc. 1-1 at 56, 63; Doc. 6 at 6; Doc. 15 at 2; Doc. 16 at 2; Doc. 18 ¶ 3; Doc. 19 ¶ 22; Doc. 19-1 at 2, 6; Doc. 20 ¶ 29.  Scott also claims that Hanson and Pechous did not provide him with writing paper or ink for his pen to write the courts.  Doc. 1-1 at 56, 63; Doc. 6 at 6; Doc. 15 at 2; Doc. 16 at 2; Doc. 18 ¶ 3; Doc. 19 ¶ 22; Doc. 19-1 at 6; Doc. 20 ¶ 29.  Scott alleges that he has not been allowed to make legal copies or timely mail legal papers.  Doc. 6 at 6; Doc. 19 ¶ 22; Doc. 23 ¶ 5.  Scott alleges that he has been denied writing utensils and grievance forms.  Doc. 20 ¶ 35; Doc. 23 ¶¶ 1–2.

Scott claims that Pechous refused his request for mail but offered her services to other inmates.  Doc. 9 at 2.  Scott also claims that Pechous forbade other unit coordinators from assisting him.  Doc. 15 at 12.  Scott alleges that he has to choose to spend his money to eat or buy postage stamps to stay in contact with the courts.  Doc. 9 at 2; Doc. 19-1 at 48.  He has alleged that he was not allowed to make copies or mail legal papers, but Scott has regularly mailed legal filings to this Court.[17]  See Doc. 24-1 at 4, 8, 10.  Scott also has attached copies of grievances filed after the dates that he claims he was denied his requests for grievances, legal copies, and writing supplies.  See id.

Although Scott's allegations may allege mere delay, instead of actual injury, this Court cannot determine at this stage that Scott's access to the courts claim is wholly without merit.  Thus, Scott's First Amendment access to the courts claim against Mayer, Hanson, and Pechous in their official capacities for injunctive relief and individual capacities survives § 1915A screening.

---

[17] Scott also alleges that his right to access to the courts has been denied for his small claims action. Doc. 22 ¶ 7; Doc. 22-1 at 2; Doc. 23-1 at 3.  "The right of access to the courts is satisfied if the prisoner has 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.' " Zink v. Lombardi, 783 F.3d 1089, 1108 (8th Cir. 2015) (quoting Lewis, 518 U.S. at 356).  Because Scott's small claims action is not a challenge to his sentence or conditions of confinement, he fails to state a claim for violation of his First Amendment right to access the court for his small claims action.

b.      **Eighth Amendment**

(i)      **Excessive Force**

Scott sues Van Blair Com, Rower, Alexis, Mayer, Haley, Moore, and Robinson in their individual and official capacities for excessive force in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  Doc. 1-1 at 32–33; Doc. 1-2 at 11; Doc. 6 at 4–5; Doc 15 at 12; Doc. 20 ¶¶ 32, 45, 47.  The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain."  Hudson v. McMillian, 503 U.S. 1, 5 (1992).  In determining whether excessive force was used, the "core judicial inquiry . . . [is] whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (quoting Hudson, 503 U.S. at 7).  To determine if force was reasonable and in good faith, courts may consider the need for applying force, the relationship between that need and the amount of force utilized, the threat the responsible officials reasonably perceived, any efforts used to diminish the severity of a forceful response, and the extent of the injury inflicted.  Walker v. Bowersox, 526 F.3d 1186, 1188 (8th Cir. 2008) (per curiam).

Here, Scott alleges that Van Blair Com used excessive force when he threw a magazine at Scott while Scott was walking through the metal detector.  Doc. 1-1 at 32–33; Doc. 1-2 at 11; Doc. 20 ¶ 45.  Scott has not alleged physical injury from Van Blair Com tossing the magazine nor any other force by Van Blair Com against him.  Thus, Scott's Eighth Amendment claim for excess force against Van Blair Com does not survive § 1915A screening.

Scott claims that Rower, Alexis, and Mayer were verbally abusive.  Doc. 20 ¶¶ 32, 34–35; Doc. 24 ¶ 4.  "Verbal abuse is normally not a constitutional violation."  Doe v. Gooden, 214 F.3d 952, 955 (8th Cir. 2000) (citing Martin, 780 F.3d at 1339).  Thus, Scott's Eighth Amendment excessive force claim against Rower, Alexis, and Mayer is dismissed without prejudice for failure

to state a claim upon which relief can be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Scott claims that Haley and Moore applied pressure, which caused something to pop in Scott's back. Doc. 6 at 4–5. Scott screamed in pain, and Haley and Moore required Scott to walk up the stairs. Id. at 5. Scott alleges that he had severe back pain because of Haley and Moore's use of excessive force. Id. Thus, Scott's Eighth Amendment excessive force claim against Haley and Moore in their official capacities for injunctive relief and individual capacities survives § 1915A screening.

Scott claims that Robinson "failed to stop the altercation [by Haley and Moore] and just looked on." Doc. 15 at 12. See also Doc. 20 ¶ 47. The Eighth Circuit has held that when a prison official witnesses excessive force but fails to intervene, the proper claim is deliberate indifference, not excessive force. Buckner v. Hollins, 983 F.2d 119, 122–23 (8th Cir. 1993) ("While the Whitley/Hudson [excessive force] standard might be applicable in assessing [defendant officer's] behavior had he intervened in the altercation and caused further injury to [inmate plaintiff], it is not the appropriate one for determining [defendant officer's] liability for failing to intervene.") "A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault." Williams v. Mueller, 13 F.3d 1214, 1216 (8th Cir. 1994). Thus, Scott's claim against Robinson in his individual and official capacities for excessive force is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). Scott's Eighth Amendment failure to intervene claim against Robinson in his official capacity for injunctive relief and individual capacity survives § 1915A screening.

### (ii)     Failure to Protect

Scott claims that he has alerted Bittinger, Maturan, mental health officials, officers, and unit staff that he received death threats. Doc. 18 ¶ 4. Construing Scott's complaint liberally, he alleges a failure to protect claim against Bittinger and Maturan. Id. ¶ 4; Doc. 15 at 13. The Supreme Court has explained that "the protection [an inmate] is afforded against other inmates" is a condition of confinement akin to food, clothing, and medical care. Wilson v. Seiter, 501 U.S. 294, 303 (1991). To prevail on an Eighth Amendment claim for failure to protect, a prisoner "must establish first, that he is incarcerated under conditions posing a substantial risk of serious harm, and second, 'deliberate indifference' to that risk." Spruce v. Sargent, 149 F.3d 783, 785 (8th Cir. 1998) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "[A] plaintiff must show that a defendant was *personally involved* in the alleged deprivation of rights and *deliberately interfered* with those rights." Kenyon v. Dooley, 2014 WL 3700878, at *3, 2014 U.S. Dist. LEXIS 101673, at *10 (D.S.D. July 25, 2014) (citing DuBois v. Dooley, 277 F. App'x 651, 652 (8th Cir. 2008) (per curiam)). A "prisoner may have viable failure-to-protect claim without sustaining serious harm, and does not need to 'await a tragic event [such as an] actual assault before obtaining relief[.]" Blackmon v. Lombardi, 527 F. App'x 583, 585 (8th Cir. 2013) (per curiam) (quoting Farmer, 511 U.S. at 845–47 (alternation in original)). The Eighth Circuit has also accepted that a warden was aware of a dangerous condition because the inmate plaintiff had filed a grievance, which would have alerted the defendant to the incident. Id. (citing Norman v. Schuetzle, 585 F.3d 1097, 1104 n.1 (8th Cir. 2009)).

"Deliberate indifference requires a showing that the official knew the risk existed, but disregarded it." Spruce, 149 F.3d at 785 (citing Farmer, 511 U.S. at 837). To establish deliberate interference, a plaintiff "must show both an objective element, that the deprivation was sufficiently

serious, and a subjective element, that the defendant acted with a sufficiently culpable state of mind." Kenyon, 2014 WL 3700878 at *4 (quoting Coleman, 114 F.3d at 784). Mere negligence does not constitute deliberate indifference. Warren v. Missouri, 995 F.2d 130, 131 (8th Cir. 1993).

Scott alleges that "he has written 'kites' to the Chief Warden Teresa Bittinger, the ADA Coordinator/Corrections Specialist: Melissa Maturan, and alerted mental health, officers and unit staff to these substantial risks to serious harm and death threats." Doc. 18 ¶ 4. Scott alleges that defendants were deliberately indifferent. Id. ¶ 5. Because Scott alleges individual conduct by Bittinger and Maturan, his Eighth Amendment failure to protect claim against Bittinger and Maturan in their official capacities for injunctive relief and individual capacities survives § 1915A screening.

### (iii)    Deliberate Indifference to Serious Medical Needs

Scott alleges that defendants have denied him medical care during his incarceration at the SDSP. Construing Scott's complaint liberally, he brings a claim for deliberate indifference to serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Id. at 104–05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious

medical needs." Id. at 106.  Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions.  Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing Est. of Rosenberg, 56 F.3d at 37).

The deliberate indifference standard includes both an objective and subjective component. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)).  The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." Id. (citing Coleman, 114 F.3d at 784).  "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.' " Coleman, 114 F.3d at 784 (quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)).  To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

Scott alleges facts sufficient to state a claim for deliberate indifference to his serious medical needs.  He alleges that he has severe medical conditions of hypertension and epilepsy. Doc. 20 ¶¶ 28, 39; Doc. 21-1 at 15–21.  He claims that he has been denied his necessary medications on several occasions, which have caused Scott to suffer several seizures.  Doc. 1-1 at 34, 63, 66, 72; Doc. 1-2 at 8; Doc. 15 at 7; Doc. 18 ¶ 7; Doc. 19 ¶ 11; Doc. 20 ¶¶ 28, 39; Doc. 21-1 at 15–21; Doc. 26 ¶ 6.  He claims that there has been systemic deliberate indifference to his medical needs.  Doc. 20 ¶ 64.  Scott's individual capacity claim must allege that each individual defendant was aware of and deliberately indifferent to his serious medical needs.  See Farmer, 511 U.S. at 837.

Scott alleges that Dr. Haynes "failed to supervise, train, discipline, and at his administrative duties. When he was deliberately indifference [sic] to a serious medical need, when he failed to intervene when his Health Service Staff did not, or delayed [Scott's] necessary doctors prescribed medications, or by a licensed physcian [sic] on several occasions." Doc. 20 ¶ 28 (internal quotations omitted). Scott alleges that Bittinger "has been deliberately indifference [sic] to a serious medical need because [Scott's] chronic conditions are well documented and she has failed to train, supervise, monitor, discipline, and at her administrative duties officers, unit staff, and health service officials." Id. ¶ 29. Scott claims that in respect to his medical care, Wasko has "failed to train, supervisor, and monitor" medical staff. Doc. 1-2 at 8. He also alleges that Wasko is a "final policy maker [and] has done very little to supervise, train, monitor, and discipline her staff and subordinates[.]" Doc. 20 ¶ 31.

Scott claims that he told Rower that he needed his necessary medication, but Rower claimed that Scott's medications were lost in transport. Id. ¶ 32. Scott claims that Tinker "failed to train, monitor, supervise, and discipline her nursing staff and subordinates, especially when she learned of their conduct and [Scott's] numerous seizures[.]" Id. ¶ 38. Scott sues Directly Responsible Clinician because of delays in receiving his necessary medication, which caused him to suffer seizures. Id. ¶ 40. Scott sues John Doe "[f]or failing to give [Scott] his Doctors Prescribed Necessary Medication and Placing him at a risk of serious harm especially when [they] know that he suffers from well documented chronic care conditions." Id. ¶ 41.

Scott claims that Moore "refused [Scott] medical treatment" after Moore injured Scott's back and "was also instrumental in making sure [Scott] was not seen for his serious medical needs by the Health Service Staff and his subordinate officers." Id. ¶ 42. Scott claims that after his back injury, Robinson "tried to keep [Scott] from being treated for his injuries at (Triage), and from

health service staff in Jameson Annex[.]" Id. ¶ 47. Scott alleges that Haley was involved with the injury to his back and denial of medical care on June 13, 2023. Id. ¶ 43; Doc. 1-1 at 93.

Scott claims that Elehrs "refused [Scott] his necessary medications 'Lisinopril' and 'HCTZ', for Hypertension/High Blood [pressure] when he was hand cuffed/tacked down in the Federal Hall holding cell waiting on transport to the Jameson Annex 'SHU'[.]" Doc. 20 ¶ 44. Scott claims that Kerouska "in concert and on duty with Officer Elehrs refused to give [him] his necessary medications 'Lisinopril' and 'HCTZ' on 6/12/2023, [and] 'she ignored the plaintiff's pleas and cries for help.' " Id. ¶ 46.

Scott claims that when he suffered a seizure on June 12, 2023, Sarah "refused [him] any medical aid or attention . . . 'when [he] told her that he felt a seizure coming on and that the room was going in circles.' " Id. ¶ 48. Scott claims that he wrote a letter excusing Alexis's behavior as a nurse in order to receive his medication at the prescribed times. Id. ¶ 49. He also claims that while he was experiencing a seizure, "Alexis was there cracking jokes and laughing at [him] while [he] was shaking, and her demeanor was festive." Doc. 15 at 6.

Scott alleges that Ryan was aware of his seizure condition because Ryan knew that Scott had to be housed in the Jameson Annex A-Floor when sent to the SHU for medical monitoring and easier access to emergency medical services. Doc. 20 ¶ 39. Scott does not allege that Ryan was deliberately indifferent to his serious medical needs. Id. ¶¶ 12, 39. Thus, Scott's Eighth Amendment deliberate indifference to serious medical needs claim against Ryan in his individual capacity is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Thus, Scott's Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Haynes, Bittinger, Wasko, Rower, Tinker, Directly Responsible Clinician, John Doe,[18] Moore, Haley, Elehrs, Kerouska, Robinson, Sarah, and Alexis in their individual capacities survives § 1915A screening. Scott's Eighth Amendment deliberate indifference to serious medical needs claim against all other defendants in their individual capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Although personal involvement is generally not required in official capacity claims for injunctive relief, see Ex parte Young, 209 U.S. at 157, because the alleged constitutional violation is cruel and unusual punishment in violation of the Eighth Amendment and because punishment requires intent, some level of subjective knowledge is still required. See Farmer, 511 U.S. at 844. Other courts have held that this subjective component can be met through "the institution's historical indifference" rather than the knowledge held by a specific individual after that individual was substituted as the named official capacity defendant. LaMarca v. Turner, 995 F.2d 1526, 1542 (11th Cir. 1993); see also Alberti v. Sheriff of Harris Cnty., 978 F.2d 893, 894–95 (5th Cir. 1992) (per curiam) (finding "that the state knew" of severe overcrowding in Harris County jails); Terry ex rel. Terry v. Hill, 232 F. Supp. 2d 934, 944 (E.D. Ark. 2002) (considering "the entire state of Arkansas, including the executive and legislative branches," to determine whether "the State ha[d] been deliberately indifferent to the needs of pretrial detainees" because defendant, "[i]n his official capacity, . . . [was] merely a representative of . . . the State of Arkansas in the system of mental health treatment" (footnote omitted)).

---

[18] Scott will have to identify "Directly Responsible Clinician" and "John Doe" in order to serve them. This Court bears no responsibility to figure out for Scott to whom Scott intends to refer or sue.

Scott sufficiently alleges institutional awareness of and indifference to his serious medical needs to state an official capacity claim for injunctive relief. But Scott only has standing to bring a claim for injunctive relief if the relief he seeks would redress his alleged injuries. See Patel, 515 F.3d at 816 (citing Hein, 551 U.S. at 598). Scott requests a preliminary and permanent injunction ordering defendants to stop the "[s]ystemic deliberate indifference to his serious medical needs[.]" Doc. 20 ¶ 64. Scott also "would like to have his Doctors [sic] Prescribed medications Necessary to his survival given to him on time or without delay." Id. Thus, Scott's Eighth Amendment deliberate indifference to serious medical needs claim against all defendants employed by the State of South Dakota in their official capacities for injunctive relief survives § 1915A screening. Thus, Scott's Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening.

### (iv)    Deliberate Indifference to Conditions of Confinement

Scott brings a claim for conditions of confinement violating his Eighth Amendment right to be free from cruel and unusual punishment. Doc. 20 ¶ 56. "[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.' " Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995) (quoting Farmer, 511 U.S. at 832). The Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal quotation omitted). The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care, and reasonable safety[.]" Helling v. McKinney, 509

U.S. 25, 32 (1993) (internal quotation omitted).  Prison conditions of confinement claims include

threats to an inmate's health and safety.  Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008).

In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner

must prove that (1) objectively, the deprivation was "sufficiently serious" to deprive him of "the

minimal civilized measure of life's necessities" or to constitute "a substantial risk of serious harm"

to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to the risk

of harm posed by the deprivation.  Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998) (quoting

Farmer, 511 U.S. at 834).  An Eighth Amendment challenge to conditions of confinement requires

examining the totality of the circumstances.  Villanueva v. George, 659 F.2d 851, 854 (8th Cir.

1981) (en banc).  Even if no single condition would be unconstitutional in itself, the cumulative

effect of prison conditions may subject inmates to cruel and unusual punishment.  See id.; see also

Tyler v. Black, 865 F.2d 181, 183 (8th Cir. 1989) (en banc).

Under Farmer, an inmate need not "await a tragic event" when seeking a preventive remedy

for unsafe conditions.  511 U.S. at 845 (quoting Helling, 509 U.S. at 33–34).  Although Farmer

was decided in the context of an inmate seeking injunctive relief to prevent future harm, the United

States Court of Appeals for the Eighth Circuit has applied this principle to claims seeking both

injunctive relief and money damages.  See Blackmon, 527 F. App'x at 585.

Here, Scott alleges that he has been placed in the SHU on several occasions.  While in the

SHU, Scott did not have access to a law library, a computer, a tablet, a kiosk, a phone, a copy

machine, writing paper, extra ink for his pen, the court, or his disability rights advocate.  Doc. 1-1

at 56, 63; Doc. 6 at 6; Doc. 15 at 2; Doc. 16 at 2; Doc. 18 ¶ 3; Doc. 19 ¶ 22; Doc. 19-1 at 2, 6; Doc.

20 ¶ 29.  Scott also claims that while he was in the SHU, he was not provided with the pizzas he

ordered.  Doc. 1-1 at 16, 50, 53, 64, 90; Doc. 6 at 4, 6.  He has also been denied his medications,

which resulted in him having several seizures. Doc. 19 ¶ 20; Doc. 20 ¶¶ 28, 31, 39; Doc. 21-1 at 15–21. He alleges that he has been subject to death threats. Doc. 15 at 4; Doc. 18 ¶¶ 1, 4; Doc. 19 ¶ 27. Although some facts do not allege a violation of his Eighth Amendment right, such as not getting pizza delivery, Scott has collectively alleged sufficient facts to state an Eighth Amendment claim for deliberate indifference to unsafe conditions of confinement.

As analyzed under Scott's failure to protect and deliberate indifference to serious medical needs claims, Scott alleges individual conduct by Maturan, Dr. Haynes, Bittinger, Wasko, Rower, Tinker, Directly Responsible Clinician, John Doe, Moore, Elehrs, Kerouska, Robinson, Sarah, and Alexis. Thus, Scott's Eighth Amendment conditions of confinement claim against Maturan, Dr. Haynes, Bittinger, Wasko, Rower, Tinker, Directly Responsible Clinician, John Doe, Moore, Elehrs, Kerouska, Robinson, Sarah, and Alexis in their individual capacities survives § 1915A screening.

Scott sufficiently alleges institutional awareness of and indifference to the unsafe conditions of confinement to state an official capacity claim for injunctive relief. He requests injunctive relief ordering the defendants to provide "his Doctors Prescribed medications Necessary to his survival given to him on time or without delay" and to "stop immediately any and all violations of [his] constitutional rights[.]" Doc. 20 ¶ 64. Thus, because Scott seeks an injunction to prevent further threats to his safety, he has standing to bring these a claim for injunctive relief. See Patel, 515 F.3d at 816 (citing Hein, 551 U.S. at 598). Scott's Eighth Amendment conditions of confinement claim against all defendants who are employed by the State of South Dakota in their official capacities for injunctive relief survives § 1915A screening. Thus, Scott's Eighth Amendment conditions of confinement claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe,

Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening.

### c.   Fourteenth Amendment

#### (i)   Due Process

Scott alleges violations of his Fourteenth Amendment due process rights.  Doc. 20 ¶ 56. Construing Scott's complaint liberally, he alleges a due process violation for loss of his job and Earned Discharge Credits.  Id. ¶ 29.  Scott also alleges a due process violation for loss of his property and stolen phone-time.  Id.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake."  Smith v. McKinney, 954 F.3d 1075, 1079 (8th Cir. 2020) (quoting Wilkinson v. Austin, 545 U.S. 209, 221 (2005)).  But "[i]nmates have no constitutional entitlement to tenure in prison jobs."  Lyon v. Farrier, 727 F.2d 766, 769 (8th Cir. 1984) (per curiam) (citation omitted).  "Whatever liberty or property interests inhere in prison employment are the product of state law."  Id. (citing Peck v. Hoff, 660 F.2d 371, 373 (8th Cir. 1981)); see also I.S.B. v. State of S.D. Comm'r of Admin., 2011 WL 1316594, at *9, 2011 U.S. Dist. LEXIS 37036, at *26 (D.S.D. Apr. 1, 2011) ("[A] property interest in prison employment, and in the compensation derived from it, can only be created by state law." (citing Lyon, 727 F.2d at 769)). A property interest in prison employment is created only when state law uses "language of an unmistakably mandatory character[.]"  Lyon, 727 F.2d at 769 (quotation omitted).

Here, Scott fails to state a claim for violation of his Fourteenth Amendment due process rights regarding prison employment.  Because Scott has no constitutional right to prison employment, he must identify state law that creates a property interest in prison employment

through the use of "language of an unmistakably mandatory character" under <u>Lyon</u>.   <u>See id.</u>
(quotation omitted).   Scott identifies no such statute, and the South Dakota statute governing
compensation for inmate labor uses permissive, not mandatory, language.   <u>See</u> SDCL § 24-4-9
("The warden may authorize monetary compensation to inmates for work performed under the
provisions of [the South Dakota statute authorizing inmate labor].").

Scott also alleges a due process violation for not allowing him to get Earned Discharge
Credits, despite being cleared of alleged disciplinary violations. Doc. 20 ¶ 29.   The Eighth Circuit
has explained that "[g]ood-time (or earned-time) credits usually shorten an inmate's sentence.
Therefore, when an inmate alleges unlawful deprivation of good-time credits, the relief he seeks
is immediate or speedier release from imprisonment and 'his sole federal remedy is a writ of habeas
corpus.' " <u>Minter v. Bartruff</u>, 939 F.3d 925, 928 (8th Cir. 2019) (quoting <u>Preiser v. Rodriguez</u>,
411 U.S. 475, 500 (1973)).   In <u>Thares v. Wallinga</u>, this Court found that a plaintiff's "§ 1983 claim
seeking injunctive relief against [defendant] in her official capacity for failure to award Earned
Discharged Credits" was barred.   2023 WL 3389030, at *8, 2023 U.S. Dist. LEXIS 84594, at *29
(D.S.D. May 11, 2023).

Here, although Scott does not seek injunctive relief providing Earned Discharge Credits,
he "want[s] to become gainfully employed so that [he] can work [his] way out of prison and get
(Earned Discharge Credits) or (EDC's)[.]   However, out of retaliation Prison Officials will not
give [Scott] a job which 'extends [his] prison term.' " Doc. 20 ¶ 64.   But prisoners do not have a
right to prison employment. <u>See</u> <u>Miller v. Benson</u>, 51 F.3d 166, 170 (8th Cir. 1995); <u>Lomholt v.</u>
<u>Holder</u>, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam).   He seeks money damages for the
deprivation of his rights.   <u>See</u> Doc. 20 ¶¶ 65–66.   "[I]n order to recover damages for allegedly
unconstitutional conviction or imprisonment, or for other harm caused by actions whose

unlawfulness would render a conviction or sentence invalid," a plaintiff must show "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" Heck v. Humphrey, 512 U.S. 477, 486–87 (1994) (footnote omitted). Scott has not made such a showing. Thus, he cannot bring a claim under the Fourteenth Amendment's Due Process Clause regarding his employment or EDCs.

Scott also alleges a due process violation for loss of his personal property when unit staff failed to pack up his items for a day-and-a-half when he was placed in the SHU. Doc. 19 ¶¶ 14–15, 21; Doc. 19-1 at 8, 39, 41, 45, 48, 57–58; Doc. 20 ¶ 29; Doc. 21-1 at 32–33, 59–60. Scott requests to be refunded for his stolen property. Doc. 19 ¶ 14; Doc. 20 ¶ 36. "[T]o state a claim for relief under § 1983, a plaintiff must allege sufficient facts to show '(1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)). The second prong is not met because Scott only alleges negligent conduct. See Doc. 21-1 at 50, 62; Doc. 22-1 at 11. Negligence, even gross negligence, is not actionable under § 1983. Sellers ex rel. Sellers v. Baer, 28 F.3d 895, 902–03 (8th Cir. 1994) (citing Myers v. Morris, 810 F.2d 1437, 1468 (8th Cir. 1987), cert. denied, 484 U.S. 828 (1987)). Thus, Scott's due process claim for loss of his personal property and phone time is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Scott alleges that his former cellmate could access his tablet because GTL required all inmates to change their tablet pin number to their inmate number and their date of birth. Doc. 20 ¶ 30. Construing Scott's complaint liberally, he alleges a due process violation against GTL for

loss of his phone time. Id. But Scott has not alleged sufficient facts to state a due process claim against GTL because he has not alleged wrongful conduct by GTL. Id.; Zutz, 601 F.3d at 848. Thus, Scott's Fourteenth Amendment due process claim against GTL is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Construing Scott's complaint liberally, he alleges a Fourteenth Amendment insufficiency of evidence claim because he was disciplined without sufficient evidence. See Doc. 1-1 at 61. Scott had a disciplinary hearing about the M-4 for allegedly threatening Haley. Id. at 56, 60. A disciplinary hearing decision must be supported by "some evidence." See Holt v. Caspari, 961 F.2d 1370, 1372 (8th Cir. 1992) (quoting Superintendent v. Hill, 472 U.S. 445, 455 (1985)). "[T]he 'relevant question is whether there is any evidence in the record that *could support* the conclusion reached by the disciplinary board.' " Brown v. Frey, 807 F.2d 1407, 1414 (8th Cir. 1986) (quoting Hill, 472 U.S. at 455–56 (emphasis added)). The some evidence standard does not require officials to provide all evidence. See Freitas v. Auger, 837 F.2d 806, 809 (8th Cir. 1988); Allen v. Purkett, 5 F.3d 1151, 1153 (8th Cir. 1993) (per curiam). The disciplinary findings document states that the disciplinary hearing officer's finding was based on Scott's "write-up, video, inmate statement, [and] informational[.]" Doc. 1-1 at 60. Scott claims that the allegation that he threatened staff was not true, but the disciplinary hearing officer states that "[b]oth the write-up and an informational written by the Nurse state that [Scott] threatened staff." Id. The Eighth Circuit has held that in a disciplinary hearing, "a report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as 'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." Hartsfield v. Nichols, 511 F.3d 826, 831 (8th Cir. 2008). Thus, Scott's Fourteenth Amendment

due process claim for insufficient evidence is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### (ii)    Equal Protection

Scott claims that defendants violated his equal protection rights under the Fourteenth Amendment.  Doc. 20 ¶ 56.  The Equal Protection Clause of the Fourteenth Amendment requires the government to " 'treat similarly situated people alike,' a protection that applies to prison inmates."  Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 984 (8th Cir. 2004) (quoting Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999)).  To show an equal protection violation, a plaintiff "must show that he is treated differently than a similarly situated class of inmates, that the different treatment burdens one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest."  Id. (citing Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc)).  It is also an equal protection violation if "the different treatment is based upon either a suspect classification or a fundamental right."  Patel, 515 F.3d at 815 (8th Cir. 2008) (internal quotations and citations omitted).  "Suspect classifications include those such as race, alienage, gender, or national origin."  Knapp v. Hanson, 183 F.3d 786, 789 (8th Cir. 1999) (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985)).

A "class of one" equal protection claim was recognized by the United States Supreme Court in Village of Willowbrook v. Olech, 528 U.S. 562 (2000).  The Eighth Circuit has applied the "class of one" analysis to a prison setting.  Nolan v. Thompson, 521 F.3d 983, 989–90 (8th Cir. 2008).  In Nolan, because the plaintiff had not alleged he was a member of a protected class or that his fundamental rights had been violated, the court found he had to show that defendants "systematically and 'intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment.' "  Id. at 989 (quoting Olech, 528 U.S. at

564).  The plaintiff had to "provide a specific and detailed account of the nature of the preferred treatment of the favored class[.]"  Id. at 990 (quoting Jennings v. City of Stillwater, 383 F.3d 1199, 1214–15 (10th Cir. 2004)).

Here, Scott alleges a Fourteenth Amendment equal protection claim against Bittinger, Johnston, Wasko, Ellis, Hanson, Mayer, Van Blair Com, Alexis, and Aramark.  Doc. 20 ¶¶ 29–31, 34–35, 37, 45, 49, 52.  He claims that he is an African American and was treated differently than other inmates because other "[i]nmates have been fired and hired back, or given unit red shirt jobs the same day that they were terminated from the kitchen."  Doc. 21-1 at 57.  See also Doc. 20 ¶ 52. A corporation acting under color of state law may be held liable under § 1983 only "for harms caused by its own unconstitutional customs or policies."  Stearns v. Inmate Servs. Corp., 957 F.3d 902, 906 (8th Cir. 2020) (internal citations omitted).  See also Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975–76 (8th Cir. 1993) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978)).  "The proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983."  Sanders, 984 F.2d at 976.  Because Scott does not allege a policy or custom, his Fourteenth Amendment equal protection claim against Aramark is dismissed without prejudice for failure to state a claim upon which relief can be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Scott alleges that he was treated differently than other inmates because he filed grievances, complaints, and lawsuits.  Doc. 21-1 at 57–58; Doc. 26 ¶ 13.  Scott claims that he has been treated differently than similarly situated inmates and is "being unfairly singled out for mistreatment[.]" Doc. 26 ¶ 11.  See also id. ¶ 12; Doc. 21-1 at 28, 41; Doc. 19 ¶ 18; Doc. 20 ¶ 31; Doc. 22 ¶ 16. Scott alleges that he was being treated unfairly and racially discriminated against by officers, unit staff, and prison officials.  Doc. 1-1 at 11, 33; Doc. 26 ¶ 6.

Scott alleges racial taunting by Van Blair Com and Alexis.[19]  Doc. 20 ¶ 31, 35, 45, 49.  He also alleges that Bittinger, Johnston, Ellis, Hanson, and Mayer were involved with Duffy's receipt of a new television and denial of Scott's request.  Id. ¶¶ 29–30, 34–35, 37.  He claims that Wasko failed to train her staff, which resulted in the different treatment to Scott.  Id. ¶ 31.  Scott "states that he is most definately [sic] being unfairly singled out for mistreatment, but if this Court sees differently and it is not based on [his] race, ethnicity, gender, Muslim (Islamic Religion), or some other suspect or quasi-suspect factor, he believes that he still can make an equal protection claim."  Doc. 26 ¶ 11.  Scott claims that he "has shown on numerous occasions to this very Court that he is being treated differently than other prisoners and that his treatment is not rationally related to a legitimate government purpose."  Id. ¶ 12.  Because this Court cannot determine that Scott's equal protection claim is wholly without merit, Scott's Fourteenth Amendment equal protection claim against Bittinger, Johnston, Wasko, Ellis, Hanson, Mayer, Van Blair Com, and Alexis in their individual capacities survives § 1915A screening.

Scott's Fourteenth Amendment equal protection claim against defendants in their official capacities for injunctive relief need only allege that each defendant, "by virtue of his [or her] office, has some connection" with the unconstitutional policy in question for which Scott seeks injunctive relief.  See Ex parte Young, 209 U.S. at 157.  Scott seeks injunctive relief ordering defendants to "stop treating him differently from same and similar [sic] situated inmates[.]"  Doc. 20 ¶ 64.  Scott has standing to bring a Fourteenth Amendment equal protection claim against defendants in their official capacities for injunctive relief.  See Patel, 515 F.3d at 816 (citing Hein, 551 U.S. at 598).

---

[19] Although Scott claims that Hanson informed him that Alexis acted in a similar manner to other inmates, this Court during the screening process assumes as true the facts alleged in the complaint. Doc. 20 ¶¶ 34–35; Est. of Rosenberg v. Crandell, 56 F.3d at 36. Thus, Scott has alleged sufficient facts for his equal protection claim against Alexis to survive § 1915A screening.

Scott's Fourteenth Amendment equal protection claim against all defendants employed by the State of South Dakota in their official capacities for injunctive relief survives § 1915A screening. Thus, Scott's Fourteenth Amendment equal protection claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening.

### (iii)    Failure to Investigate

Scott brings a claim against defendants for failure to investigate his grievances. Doc. 19-1 at 46; Doc. 20 ¶¶ 29, 50; Doc. 21-1 at 35, 44–45, 61, 64–66, 68. Although the Eighth Circuit has recognized a due process claim against "reckless or intentional failure to investigate that shocks the conscience[,]" this right protects criminal defendants. See Akins v. Epperly, 588 F.3d 1178, 1184 (8th Cir. 2009). A criminal defendant can bring such a claim in the following circumstances: "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." Id. Here, Scott alleges that defendants failed to investigate his grievances. His claim does not allege that defendants recklessly or intentionally failed to investigate criminal charges against him. Thus, Scott's claim for failure to investigate against defendants in their individual and official capacities is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Construing his complaint liberally, Scott brings a Fourteenth Amendment procedural due process claim for failure to process grievances. Doc. 15 at 5; Doc. 19 ¶ 28; Doc. 22 ¶¶ 9, 12; Doc. 23 ¶¶ 1, 5. "While a violation of a state-created liberty interest can amount to a violation of the Constitution, not every violation of state law or state-mandated procedures is a violation of the

Constitution." <u>Buckley v. Barlow</u>, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam) (holding that a refusal to process grievances alone did not state a constitutional deprivation). "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the [F]ourteenth [A]mendment." <u>Id.</u> (first alteration in original) (quoting <u>Azeez v. DeRobertis</u>, 568 F. Supp. 8, 10 (N.D. Ill. 1982)); <u>see also</u> <u>King v. Houston</u>, 556 F. App'x 561, 563 (8th Cir. 2014) (per curiam) (explaining that, under <u>Buckley</u>, "prison officials' failure to process or investigate grievances, without more, is not actionable under § 1983" (citing 997 F.2d at 495)). Scott claims that defendants failed to file his grievances and investigate his grievances. This claim fails under <u>Buckley</u>. <u>See</u> 997 F.2d at 495. Thus, Scott's Fourteenth Amendment procedural due process claim for failure to investigate his grievances is dismissed without prejudice under 28 U.S.C §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### d.     Prison Policy

Scott alleges that defendants violated prison policies. Doc. 1-1 at 1; Doc. 15 at 9; Doc. 22-1 at 1. Scott claims that he has "a due process right to have <u>all</u> SDDOC staff follow well-established SDDOC policy and procedures." Doc. 22-1 at 1. "[T]here is no § 1983 liability for violating prison policy." <u>Gardner v. Howard</u>, 109 F.3d 427, 430 (8th Cir. 1997). Thus, Scott's claim against defendants for violating prison policies is dismissed with prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### e.     Prison Rape Elimination Act

Scott alleges that defendants violated the Prison Rape Elimination Act (PREA) in investigating his claim against Tanya and his appeals. Doc. 19-1 at 46; Doc. 20 ¶ 29; Doc. 21-1 at 44–45, 64–65. Construing his complaint liberally, Scott seeks to bring a claim against

defendants under the PREA.  But the PREA "does not create a private right of action enforceable by an individual civil litigant."  Rindahl v. Kaemingk, 4:17-CV-04088-RAL, 2017 U.S. Dist. LEXIS 105964, at *2 (D.S.D. July 10, 2017) (citation omitted).  Thus, Scott cannot bring this claim against defendants under the PREA or under § 1983.  See Gonzaga Univ. v. Doe. 536 U.S. 273, 286 (2002) ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.").  Thus, Scott's claim under the PREA is dismissed with prejudice under 28 U.S.C.§§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### f.      Religious Land Use for Incarcerated Persons Act

Construing Scott's complaint liberally, he alleges a claim for violation of his rights under Religious Land Use for Incarcerated Persons Act (RLUIPA).  Doc. 1-1 at 36–40.  "RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.' "  Holt v. Hobbs, 574 U.S. 352, 360 (2015) (quoting 42 U.S.C. § 2000cc-5(7)(A)).  "[A] prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation," and the prisoner must show that the prison policy substantially burdens the prisoner's exercise of religion.  Id. at 360–61.

To establish a prima facie case under RLUIPA, a plaintiff must show "1) that he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened."  Smith v. Allen, 502 F.3d 1255, 1276 (11th Cir. 2007), abrogated on other grounds by Sossamon v. Texas, 563 U.S. 277 (2011); see also 42 U.S.C. § 2000cc-1(a).  If the plaintiff succeeds in making a prima facie showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest.  Allen, 502 F.3d at 1276 (citations omitted).  Here, Scott alleges that he was denied access to church activities because he

was unable to hold his bladder for over four hours. Doc. 1-1 at 40, 42. He also requested that he be placed on the Muslim Ramadan list. Id. Scott was placed back on the Muslim Ramadan list and granted an accommodation to return to chapel activities after using the restroom. Id. at 36–39. Scott has not shown that his religious exercise was substantially burdened. Thus, Scott's RLUPIA claim fails to state a claim upon which relief may be granted and is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### g.  Freedom of Information Act (FOIA)

Scott alleges that defendants denied him access to his medical discharge summary, which he claims is a violation of his rights under the Freedom of Information Act (FOIA). Doc. 15 at 7. FOIA applies to records held by federal agencies. 5 U.S.C. § 551(1); 5 U.S.C. § 552. Here, Scott does not seek information from a federal agency; he requested a copy of his medical discharge summary from the SDSP. Doc. 15 at 7. It also appears from Scott's later filings that he received his discharge summary and other medical records. See Doc. 19-1 at 10–29; Doc. 21-1 at 7–25. Thus, Scott's claim against defendants under FOIA fails to state a claim upon which relief may be granted and is dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### h.  Americans with Disabilities Act

Scott alleges a violation of the Americans with Disabilities Act (ADA). Doc. 15 at 14. Scott attached to a supplement a form about accommodations for disabilities. Doc. 24-1 at 1. In the form, Scott alleges that he has disabilities of hypertension and epilepsy. Id. He describes that he was terminated from the kitchen for reporting Tanya. Id. He wrote that "the First Amendment prohibits prison officials and jail officials from retaliating against inmates who report complaints, file grievances, or file lawsuits." Id. (cleaned up). He claims that "the Fourteenth Amendment is limited to state action and prohibits a state to deny any person within its jurisdiction the equal

protection of the laws, such that all persons similarly situated should be treated alike." Id. (cleaned up). He also wrote that "the ADA prohibits officials from discriminating against inmates with disabilities. Officials must give disabled inmates an equal opportunity to benefit from all services, programs, and activities." Id. (cleaned up).

Title II of the Americans with Disabilities Act (ADA) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also Mason v. Corr. Med. Servs., Inc., 559 F.3d 880, 886 (8th Cir. 2009). Title V of the ADA prohibits discrimination against "any individual because such individual has opposed any act or practice made unlawful by [the ADA.]" 42 U.S.C. § 12203(a).

Here, Scott has not alleged that he was excluded from participation or subjected to discrimination because of a disability. See Doc. 24-1 at 1. Scott claims that he was terminated and discriminated against because he reported Tanya. Id. Thus, Scott's claim under the ADA is dismissed without prejudice for failure to state a claim upon which relief can be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## II.    Request for Inspection on Entry Upon Land

Scott filed a request for inspection on entry upon land. Doc. 7. It is not necessary for any of the defendants to permit Scott to "be allowed to measure, and take pictures and or photos and also inspect the Segregated Housing Cell, that he was denied his necessary medications[]" or to "take notes, photograph or take pictures, inspect, [and] measure the East Hall Holding Cell were [sic] he suffered from his second seizure . . . [after he] was once again refused [his] necessary medication[.]" Id. at 2. Photographs, measurements, and inspections of two areas of the prison

are not reasonably calculated to lead to the discovery of admissible evidence to support Scott's claim that he was denied necessary medication in violation of his Eighth Amendment right to be free from deliberate indifference to serious medical needs.[20]

### III.   Motions to Appoint Counsel

Scott filed several motions to appoint counsel. Docs. 3, 17, 18. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." Stevens v. Redwing, 146 F.3d 538, 546 (8th Cir. 1998). In determining whether to appoint counsel to a pro se litigant, this Court considers the complexity of the case, the ability of the litigant to investigate the facts, the existence of conflicting testimony, and the litigant's ability to present his claims. Id. At this time, Scott's claims do not appear to be complex, and he is able to investigate the facts and present his claims adequately. This Court believes that Scott is capable of pursuing his claims pro se at this phase of litigation, and his motions to appoint counsel, Docs. 3, 17, and 18, are denied at this time.

### IV.   Motions for a Preliminary Injunction

Scott filed a motion for a preliminary injunction, but he does not clearly specify what injunctive relief he is seeking. Doc. 16. He filed a second motion for preliminary injunction requesting this Court to "order the Department of Corrections to make 'good' on . . . reclassification and send [him] to (MDSP) [Mike Durfee State Prison], so that he can be free of threats of bodily harm, and the agents and co-workers of some of the listed defendants[.]" Doc. 18 at 8. Scott also requested that this Court (1) "Order listed Defendants, and Prison Officials, Agents, employees, and Unit Staff to immediately stop interfering with [Scott's] 'Privileged Legal

---

[20] Because Scott's request for inspection is beyond the scope of discovery permitted by Federal Rule of Civil Procedure 26(b)(1), it is not necessary for the Court to consider whether the request poses a threat to the safety and security of the prison.

Mailings / Outgoing or In-coming' " and (2) "Order Prison Officials immediately cease the retaliation, campaign of harassment, and any and all violations of his human rights and civil rights[.]" Doc. 22 ¶ 18. This Court liberally construes Scott's requests, Doc. 22, as a motion for a preliminary injunction.

A preliminary injunction is an extraordinary remedy. Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 705 (8th Cir. 2011); see also Hughbanks v. Dooley, 788 F. Supp. 2d 988, 992 (D.S.D. 2011) (citing Munaf v. Geren, 553 U.S. 675, 689–90 (2008)). "The burden of proving that a preliminary injunction should be issued rests entirely with the movant." Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995) (citation omitted).

When ruling on a motion for preliminary injunction, the court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). Since Dataphase, the Eighth Circuit has "observed that the 'likelihood of success on the merits is most significant.' " Barrett v. Claycomb, 705 F.3d 315, 320 (8th Cir. 2013) (quoting S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 776 (8th Cir. 2012)).

"[I]n the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.' " Goff, 60 F.3d at 520 (quoting Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982)). And "for an injunction to issue 'a right must be violated' and . . . 'the court must determine' whether 'a cognizable danger of future violation exists and that danger must be more than a mere possibility.' " Id. (quoting Rogers, 676 F.2d at 1214).

At this stage, Scott cannot show that he is likely to succeed on the merits. Thus, his motions for a preliminary injunction, Docs. 16, 18, and 22, are denied.

## V.    Conclusion

Accordingly, it is

ORDERED that Scott's claims against all defendants in their official capacities for money damages are dismissed without prejudice under 28 U.S.C §§ 1915(e)(2)(B)(iii) and 1915A(b)(2). It is further

ORDERED that Scott's First Amendment retaliation claim against Bittinger, Ekeren, Tanya, Linda, Maturan, Pechous, and Alexis in their individual capacities and against Aramark survives § 1915A screening. It is further

ORDERED that Scott's First Amendment retaliation claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening. It is further

ORDERED that Scott's First Amendment right to send and receive mail claim against Pechous and Mayer in their official capacities for injunctive relief and individual capacities survives § 1915A screening. It is further

ORDERED that Scott's First Amendment access to the courts claim against Mayer, Hanson, and Pechous in their official capacities for injunctive relief and individual capacities survives § 1915A screening. It is further

ORDERED that Scott's Eighth Amendment excessive force claim against Haley and Moore in their official capacities for injunctive relief and individual capacities survives § 1915A screening. It is further

ORDERED that Scott's Eighth Amendment failure to intervene claim against Robinson in his official capacity for injunctive relief and individual capacity survives § 1915A screening.  It is further

ORDERED that Scott's Eighth Amendment failure to protect claim against Bittinger and Maturan in their official capacities for injunctive relief and individual capacities survives § 1915A screening.  It is further

ORDERED that Scott's Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Haynes, Bittinger, Wasko, Rower, Tinker, Directly Responsible Clinician, John Doe, Moore, Haley, Elehrs, Kerouska, Robinson, Sarah, and Alexis in their individual capacities survives § 1915A screening.  It is further

ORDERED that Scott's Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening.  It is further

ORDERED that Scott's Eighth Amendment conditions of confinement claim against Maturan, Dr. Haynes, Bittinger, Wasko, Rower, Tinker, Directly Responsible Clinician, John Doe, Moore, Elehrs, Kerouska, Robinson, Sarah, and Alexis in their individual capacities survives § 1915A screening.  It is further

ORDERED that Scott's Eighth Amendment conditions of confinement claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska,

Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening. It is further

ORDERED that Scott's Fourteenth Amendment equal protection claim against Bittinger, Johnston, Wasko, Ellis, Hanson, Mayer, Van Blair Com, and Alexis in their individual capacities survives § 1915A screening. It is further

ORDERED that Scott's Fourteenth Amendment equal protection claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening. It is further

ORDERED that Scott's Fourteenth Amendment equal protection claim against Dr. Haynes, Bittinger, Maturan, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Sarah, and Alexis in their official capacities for injunctive relief survives § 1915A screening. It is further

ORDERED that Scott's claim against defendants for violating prison policies is dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). It is further

ORDERED that Scott's claim under the PREA is dismissed with prejudice under 28 U.S.C.§§ 1915(e)(2)(B)(ii) and 1915A(b)(1). It is further

ORDERED that Scott's claim against defendants under FOIA is dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). It is further

ORDERED that Scott's remaining claims against all defendants are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). It is further

ORDERED that defendants are not required to respond to Scott's request for inspection of premises, Doc. 7, and that request is denied. It is further

ORDERED that Scott's motions to appoint counsel, Docs. 3, 17, and 18, are denied. It is further

ORDERED that Scott's motions for a preliminary injunction, Docs. 16, 18, and 22, are denied. It is further

ORDERED that the Clerk shall send blank summons forms and United States Marshals Service Form (Form USM-285) to Scott so that he may complete the form to cause the complaint to be served upon defendants Dr. Haynes, Bittinger, Johnston, Wasko, Rower, Ekeren, Ellis, Hanson, Bertsch, Mayer, Tinker, Ryan, Direct Clinician, John Doe, Moore, Haley, Elehrs, Van Blair Com, Kerouska, Robinson, Pechous, Sarah, Alexis, Tanya, Linda, Maturan, and Aramark. It is further

ORDERED that Scott shall complete and send the Clerk of Court a separate summons and USM-285 form for each defendant. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summons. If the completed summons and USM-285 form are not submitted as directed, the complaint may be dismissed. It is further

ORDERED that the United States Marshals Service shall serve the completed summonses, together with a copy of the complaint, Doc. 1, the amended complaint, Doc. 20, supplements and declarations, Docs. 1-1, 1-2, 5, 6, 9, 11, 13, 14, 15, 18, 18-1, 19, 19-1, 21, 21-1, 22, 22-1, 23, 23-1, 24, 24-1, 25, and 26, and this order upon the defendants. It is further

ORDERED that defendants will serve and file an answer or responsive pleading to the amended complaints and supplement on or before 21 days following the date of service or 60 days if the defendant falls under Fed. R. Civ. P. 12(a)(2) or (3). It is finally

ORDERED that Scott will keep the court informed of his current address at all times.  All parties are bound by the Federal Rules of Civil Procedure and by this Court's Civil Local Rules while this case is pending.

DATED March __11ᵗʰ__, 2024.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE